**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

January 20, 2023

Francis G.X. Pileggi, Esquire
Lewis Brisbois Bisgaard & Smith, LLP
500 Delaware Avenue, Suite 700
Wilmington, DE 19801

Matthew W. Murphy, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801

RE: *In re: Dissolution of T&S Hardwoods KD, LLC,*
Civil Action No. 2022-0782-MTZ

Dear Counsel:

I write to resolve the pending motion to dismiss. For the reasons set forth below, I deny the respondents' motion to dismiss and consolidate this case with *Robinson Lumber Company, Inc. v. Lawrence N. Thompson, III, et al.*, C.A. No. 2022-0423-MTZ (Del. Ch.).

A lumber supplier and a lumber wholesale distributor joined forces and formed a limited liability company. While the venture was initially profitable, the supplier and wholesaler's relationship splintered and then collapsed. The supplier filed for dissolution of the LLC. The wholesaler moved to dismiss for failure to state a claim for dissolution. In this letter decision, I conclude the supplier's allegations of deadlock, inability to function, and lack of any equitable exit mechanism state a claim for dissolution, and so I deny the motion to dismiss.

The parties are engaged in litigation over their split in two other pending actions, including one before me in this Court. With the parties' consent, I consolidate this case with the other pending Delaware action.

## I.  BACKGROUND[1]

In 2016, petitioner T&S Hardwoods, Inc. ("T&S") and respondent Robinson Lumber Company, Inc. ("RLC") began working together to produce and sell lumber. T&S is a lumber processor and manufacturer, and its majority stockholder and manager is petitioner Lawrence N. Thompson (together with T&S, "Petitioners"). RLC is a lumber wholesaler, and is owned by its president respondent William Garner Robinson (together with RLC, "Respondents").

On October 1, 2016, the parties joined forces: T&S would provide a steady lumber supply for RLC to resell, and the endeavor would provide T&S with financing between when it cut the lumber and when the end customers paid their invoices. The parties formed T&S Hardwoods KD, LLC (the "Company"), and

---

[1] On this motion to dismiss, I draw the following facts from Petitioners' Petition, available at Docket Item ("D.I.") 1 [hereinafter "Pet."], as well as the documents attached and integral to it. *See, e.g.*, *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014). Citations in the form of "LLC Agreement —" refer to the Company's Limited Liability Company Agreement, dated October 1, 2016, attached as Exhibit 1 to the Petition and available at D.I. 1. Citations in the form of "JV Agreement — " refers to the Joint Venture Agreement between RLC, T&S, and the Company, dated October 1, 2016, attached as Exhibit 2 to the Petition and available at D.I. 1.

executed a Limited Liability Company Agreement (the "LLC Agreement") and Joint Venture Agreement (the "JV Agreement").[2]

Under the LLC Agreement, RLC and T&S each own a 50% interest in the Company.[3] The Company is manager-managed; its two managers are, and always have been, Thompson and Robinson.[4] The LLC Agreement provides, that for most decisions, the managers must reach a unanimous agreement.[5] But Robinson and RLC were charged with control over the Company's books, records, finances, financial report, bank accounts and banking relationships. Robinson and RLC's responsibilities include deciding when and in what amounts to pay T&S for lumber, controlling T&S's access to information about the Company's bank accounts, and preparing the Company's financial statements and tax returns.

The JV Agreement provided that the Company would have the option to purchase all of T&S graded lumber at the prevailing market price.[6] The Company also paid T&S a service fee to dry, package, store, and load the lumber onto trucks

---

[2] LLC Agr.; JV Agr.

[3] Pet. ¶¶ 3, 7–8, 24–25; LLC Agr. § 3.1.

[4] Pet. ¶¶ 4–5; LLC Agr. § 5.1.

[5] LLC Agr. Art. V.

[6] JV Agr. § 3.2.

for shipment to the Company's customers.[7]  The Company did not pay T&S in full for the lumber when it took title.  Instead, the Company paid T&S a portion of the money owed when it took title and paid T&S the remainder of any balance due, four to six months later, when it received payment from its customer.

So the Company and T&S could operate under this arrangement, the Company became a party to RLC's credit agreement and pledged substantially all of its assets as collateral for loans to the Company.[8]  Thompson provided a personal guaranty for any funds the Company borrowed.  The Company used the loan proceeds to pay T&S a portion of the purchase price for the lumber.  As customers paid the Company, the Company paid T&S the balance of the purchase price and pay down the loan balance.  These operations worked well for a period of time.

But over the last eighteen months, the parties' relationship has deteriorated. T&S alleges that Robinson caused the Company to stop paying T&S by March 2022. T&S states the Company owes it for over $9 million in lumber bought between October 2021 to May of 2022, even as the Company resold a substantial portion of that lumber and has over $5.2 million in cash on hand and over $700,000 in customer receivables.  Robinson and RLC have not explained the Company's refusal to pay

---

[7] *Id.* § 3.3; LLC Agr., Ex. E.

[8] JV Agr., Recital C.

T&S, despite repeated inquiries. Thompson has tried to negotiate to resume operations, offering to resume T&S lumber sales to the Company if the Company would authorize payment and assure future payments, but Robinson did not respond.

Then, in April, Robinson unilaterally terminated T&S's viewing access to the Company's bank and loan accounts. T&S (and therefore Thompson) has not been able to view information about the Company's bank and loan accounts since April 4. Thompson has made several requests that such access be restored, but Robinson has either failed or refused to do so.

On May 5, as a result of the Company's nonpayment, T&S stopped selling lumber to the Company. On May 13, RLC filed a derivative action against Thompson and T&S based on T&S's lack of sales, alleging Thompson has breached his fiduciary duties (the "Derivative Action").[9] The Derivative Action seeks an order requiring Thompson and T&S to continue to sell lumber to the Company pursuant to the Company's option in the JV Agreement. In the Derivative Action, RLC recognized that T&S's refusal to continue to sell lumber to the Company "eliminate[s] the entire purpose of the [j]oint [v]enture."[10] RLC initially sought a

---

[9] Pet. ¶¶ 16, 46; *Robinson Lumber Co., Inc. v. Thompson*, No. 2022-0423-MTZ (Del. Ch.).

[10] Pet. ¶ 50; Verified Complaint Asserting Breach of Fiduciary Duty ¶ 40, *Robinson Lumber Co.*, No. 2022-0423-MTZ (Del. Ch. May 13, 2022) (D.I. 1).

temporary restraining order, but withdrew that request; the Derivative Action has been quiet since.[11]

The parties have other disputes. They disagree as to whether, and to what extent, the Company has been damaged by alleged "overstatements of grade and footage" for green lumber T&S sold to the Company.[12] T&S maintains RLC raised these issues only after T&S became vocal about being paid, as an after-the-fact effort to justify nonpayment. Thompson and T&S allege Robinson and RLC have made improper distributions and management fee payments in violation of the LLC Agreement and to T&S's detriment. They also allege RLC has used the Company's inventory and receivables as collateral for loans made solely to RLC, manipulated the books and records of the Company to falsely appear profitable to the Company's lender, withheld financial information about the Company and its finances from T&S, and directed the lender not to communicate with T&S or Thompson.

In an effort to resolve all of these disputes, on July 8, 2022, T&S sent RLC a buy-sell purchase option notice as provided by Article VIII of the LLC Agreement. The "Buy-Sell Purchase Option" provides,

---

[11] Order, *Robinson Lumber Co.*, No. 2022-0423-MTZ (Del. Ch. Aug. 4, 2022) (granting motion to withdraw motion for temporary restraining order) (D.I. 30).

[12] Pet. ¶ 51.

> Each member shall have the right, but not the obligation, to give written notice to any other Member offering to purchase all of the Membership Interests owned by the other Member or to sell all of his or her Membership interest to the other Member in accordance with the procedures in this Article VIII (a "Purchase or Sale Notice").[13]

Once a valid purchase or sale notice is received, the non-offering member has ten days to elect "(i) to sell all of the Non-Offering Member's Membership Interest to the Offering Member, or (ii) to buy all of the Offering Member's Membership Interest, in either case for the purchase price per percentage interest and upon the other terms and conditions specified in the Purchase or Sale Notice."[14] But Robinson and RLC rejected T&S's offer outright without making any election.

Then, on August 31, while the Derivative Action remained pending, T&S filed its own lawsuit against Robinson. T&S filed a complaint in the Superior Court of Baldwin County, Georgia, against Robinson for breach of fiduciary duty in his role with T&S, relating to the nonpayment of T&S, unequal distributions made to RLC, and management and other fees paid to RLC but not T&S (the "Georgia Action").[15]

---

[13] LLC Agr. § 8.1.

[14] *Id.* § 8.3.

[15] D.I. 13, Ex. 1. This Court may take judicial notice of the Georgia Action for the purpose of establishing its "existence and content." *See Indem. Ins. Corp., RRG v. Cohen*, 2018 WL 487246, at *2 (Del. Ch. Jan. 18, 2018); *see also In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *8–9 (Del. Ch. Dec. 17, 2013) (stating a court may take

Finally, on September 2, T&S and Thompson filed this action, petitioning for dissolution of the Company (the "Petition"). Petitioners seek dissolution of the Company as provided by 6 *Del. C.* § 18-802 and request permission to wind up the Company's affairs pursuant to 6 *Del. C.* § 18-803. The Petition alleges dissolution is appropriate based on: (i) RLC and Robinson causing the Company not to pay T&S nearly $9 million for lumber T&S sold the Company; (ii) the managers' inability to agree on whether the Company has been harmed by lumber "grade and footage yield" claims; (iii) RLC and Robinson using the Company's assets to facilitate loans to RLC; (iv) RLC using its exclusive control over Company finances to freeze T&S out, including removing T&S's access to the Company's bank accounts and records and directing the lender not to communicate with T&S; and, (v) the absence of trust between the parties. The Petition claims it is no longer reasonably practicable to carry on the business of the Company—buying lumber from T&S and reselling it to RLC and other third parties—in conformity with the parties' agreements. Once the Company's current lumber inventory is sold, it will have no more lumber to sell and no more business in which to engage.

---

judicial notice of filings in other courts for limited purposes such as "understand[ing] the nature and grounds for rulings" in those courts, establishing the dates of filings, or identifying the statements made therein).

On September 9, Respondents filed a motion to dismiss for failure to state a claim upon which relief may be granted, or, in the alternative, dismiss or stay pending resolution of the other litigation.[16] The parties fully briefed the matter, and I held oral argument on the motion on November 17.[17]

## II.  ANALYSIS

I conclude Petitioners have stated a claim for dissolution and, therefore, I deny the portion of Respondents' motion seeking dismissal.  I agree with Respondents that the parallel proceedings in this Court raise some efficiency concerns.  Thus, with the parties' consent, I consolidate this action into the Derivative Action.

### A.  Petitioner Has Stated A Claim For Dissolution.

Respondents argue the Petition fails to state a claim for judicial dissolution because (1) the Petition does not adequately allege it is not reasonably practicable to carry on the business of the company, (2) the allegations do not constitute deadlock, and (3) the LLC Agreement's Buy-Sell Purchase Option is a valid exit mechanism that precludes dissolution.

The standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief are well settled:

---

[16] D.I. 4; D.I. 13 (hereinafter, "MTD OB").

[17] D.I. 20 (hereinafter, "MTD AB"); D.I. 23 (hereinafter, "MTD RB"); D.I. 25.

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[18]

Thus, the touchstone "to survive a motion to dismiss is reasonable 'conceivability.'"[19] This standard is "minimal"[20] and "plaintiff-friendly."[21] "Indeed, it may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[22] Despite this forgiving standard, the Court need not "accept conclusory allegations unsupported by specific facts" or "draw unreasonable inferences in favor

---

[18] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted); *accord In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *5 (Del. Ch. Oct. 27, 2020).

[19] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[20] *Id.* at 536 (citing *Savor*, 812 A.2d at 896).

[21] *See, e.g., Clouser v. Doherty*, 175 A.3d 86 (Del. 2017) (TABLE); *In re Trados Inc. S'holder Litig.* (*Trados I*), 2009 WL 2225958, at *9 (Del. Ch. July 24, 2009).

[22] *Cent. Mortg. Co.*, 27 A.3d at 536.

of the non-moving party."[23]  "Moreover, the court is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[24]

Petitioners seek dissolution under Section 18-802 of the Delaware LLC Act. Under Section 18-802, this Court may decree dissolution "[o]n application by or for a member or manager . . . of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement."[25]  "Given its extreme nature, judicial dissolution is a limited remedy that this court grants sparingly."[26]  Dissolution is appropriate in situations where the "LLC's management has become so dysfunctional . . . that it is no longer practicable to operate the business," such as the case of deadlock.[27]  "In the context of judicial

---

[23] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr., 189 A.3d 1255, 1277 (Del. 2018).

[24] *Trados I*, 2009 WL 2225958, at *4 (internal quotation marks omitted) (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

[25] 6 *Del C.* § 18-802.

[26] *In re Arrow Inv. Advisors, LLC*, 2009 WL 1101682, at *2 (Del. Ch. Apr. 23, 2009) (citations omitted).

[27] *In re: GR BURGR LLC*, 2017 WL 3669511, at *6 (Del. Ch. Aug. 25, 2017) (citing *In re Arrow Inv. Advisors*, 2008 WL 1101682, at *3) (emphasis omitted); *see also Mehra v. Teller*, 2021 WL 300352, at *19 (Del. Ch. Jan. 29, 2021) ("'[S]erious managerial issues,' such as strategic visions, major initiatives, and the operation and control of a company, will typically satisfy the qualitative requirements imposed by statute and common law [for dissolution]." (citing *Vila v. BVWebTires LLC*, 2010 WL 3866098, at *7 (Del. Ch. Oct. 1, 2010); and then *In re Shawe & Etling LLC*, 2015 WL 4874733, at *26–28 (Del. Ch. Aug. 13, 2015) (finding deadlock over issues including distributions to members, pursuit

dissolution, '[d]eadlock refers to the inability to make decisions and take action[.]'"[28]  But "[t]he court will not dissolve an LLC merely because the LLC has not experienced a smooth glide to profitability or because events have not turned out exactly as the LLC's owners originally envisioned."[29]  "Allegations than an LLC is currently failing to achieve its business plan, goals, and objective [or] that [its] managers have breached their fiduciary duties fall far short of this threshold."[30]

Delaware LLCs are creatures of contract.[31]  "In governance disputes among constituencies in an LLC, the starting (and end) point almost always is the parties' bargained-for operating agreement, and the court's role in these disputes is to 'interpret [the] contract [and] effectuate the parties' intent.'"[32]  In interpreting LLC

---

of acquisitions, expense true-ups to reconcile personal uses of company funds, and the hiring and retention of personnel)).

[28] *In re: GR BURGR*, 2017 WL 3669511, at *6 (citing *Meyer Nat. Foods LLC v. Duff*, 2015 WL 3746283, at *3 (Del. Ch. June 4, 2015)) (alterations in original); *accord Acela Invs. LLC v. DiFalco*, 2019 WL 2158063, at *26 n.276 (Del. Ch. May 17, 2019) ("In the context of a dissolution claim, 'deadlock' means disagreement and discord between the parties.") citations omitted)).

[29] *In re Arrow Inv. Advisors*, 2009 WL 1101682, at *2 (citations omitted).

[30] *Bet FRX LLC v. Myers*, 2022 WL 1236955, at *6 (Del. Ch. Apr. 27, 2022) (citing *In re Arrow Inv. Advisors*, 2009 WL 1101682, at *2).

[31] *E.g.*, *TravelCenters of Am., LLC v. Brog*, 2008 WL 1746987, at *1 (Del. Ch. Apr. 3, 2008).

[32] *A & J Cap., Inc. v. L. Office of Krug*, 2018 WL 3471562, at *5 (Del. Ch. July 18, 2018) (alterations in original) (quoting *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *7 (Del. Ch. June 21, 2012)).

agreements, Delaware courts treat them as any other contract,[33] aiming to "give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[34] "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."[35] In doing so, the Court will "give effect to the plain-meaning of the contract's terms and provisions,"[36] will "read a contract as a whole and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage."[37]

---

[33] *See Mickman v. Am. Int'l Processing, L.L.C.*, 2009 WL 2244608, at *2 (Del. Ch. July 28, 2009).

[34] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (internal quotation marks omitted) (quoting *GMG Cap. Inv., LLC. v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[35] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (footnotes and internal quotation marks omitted) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del.Ch. Apr. 29, 2005)).

[36] *Id.* at 1159–60; *see also Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) ("Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning.").

[37] Kuhn Constr., Inc. v. Diamond State Port Corp., 990 A.2d 393, 396–97 (Del. 2010).

### 1. Petitioners Adequately Plead Deadlock.

Respondents argue there are no allegations showing "extreme dysfunction amongst an LLC's management," to evidence deadlock.[38] I disagree. As pled, Company managers Thompson and Robinson are no longer able to work together or make decisions for the Company, which has a 50/50 ownership structure and requires unanimity for most decisions.[39]

Having gone unpaid from October 2021 to March 2022, T&S has refused since May 2022 to sell lumber to the Company. Once the Company sells its current inventory, it will have no more lumber to sell unless the managers unanimously decide to source it from someone other than T&S. The managers' attempts to resume

---

[38] MTD OB at 16 (internal quotation marks, citations, and alterations omitted); *see also id.* at 14 ("As a preliminary matter, and fatally to this entire proceeding, the Petition does not plead that the Company is suffering a deadlock that prevents it from operating." (footnote omitted)); MTD RB at 5–9.

[39] *In re: GR BURGR*, 2017 WL 3669511, at *6–7 ("Where there are two 50% owners of a company, an unbreakable deadlock can form a basis for dissolution even if the company is still engaged in marginal operations." (citing *Phillips v. Hove*, 2011 WL 4404034 (Del. Ch. Sept. 22, 2011); *Vila*, 2010 WL 3866098; and *Haley v. Talcott*, 864 A.2d 86 (Del. Ch. 2004))); *see also id.* at *7 (explaining dissolution is appropriate where there are no circumstances indicating that the parties would want to associate with each other in the future); *Fisk Ventures, LLC v. Segal*, 2009 WL 73957, at *4 (Del. Ch. Jan. 13, 2009) ("If a board deadlock prevents the limited liability company from operating or from furthering its stated business purpose, it is not reasonably practicable for the company to carry on its business."); *In re Silver Leaf, L.L.C.*, 2005 WL 2045641, at *10 (Del. Ch. Aug. 18, 2005) (explaining a company that has a 50/50 ownership split and requires a majority for decisions cannot continue to function as a business where the two sides disagree on how to run it).

operations through compromise have failed—Thompson has offered to resume sales on the condition that T&S is paid what it is owed and receives future assurances regarding payment, but Robinson and RLC have not responded. And ancillary disputes abound: RLC accuses T&S of overstating grade and footage, and T&S accuses RLC of financial wrongdoing and secrecy. T&S endeavored to trigger a buyout under the LLC Agreement, but the parties could not bring that to fruition. Instead of working through their issues as Company managers, Robinson and Thompson have filed lawsuits against one another. Robinson admits there is no longer any trust among the managers.[40] These allegations support the reasonable inference that the Company's managers and owners cannot resolve their disputes and cannot work together.[41]

The untenable situation between the two members is amplified by the 50/50 partnership structure of the LLC and the symbiotic nature of the joint venture. The LLC cannot take any meaningful action without the two sides reaching unanimous

---

[40] Pet. ¶ 17.

[41] *See Fisk Ventures*, 2009 WL 73957, at *4 (finding dissolution is appropriate given the parties' history of discord and disagreement); *Symbiont.io, Inc. v. Ipreo Hldgs., LLC*, 2021 WL 3575709, at *58–59 (Del. Ch. Aug. 13, 2021) (explaining dissolution is appropriate where any suggestion the parties could work together to operate the business is a "fantasy"); *In re Shawe*, 2015 WL 4874733, at *26–28 (finding deadlock over issues including distributions to members, pursuit of acquisitions, expense true-ups to reconcile personal uses of company funds, and the hiring and retention of personnel).

decisions, and the Company cannot operate unless T&S supplies lumber and the managers work together to sell it. In the context of such an LLC structure, this Court has found dissolution of a joint venture proper where the petitioner "has demonstrated an indisputable deadlock between the two 50% members of the LLC."[42] Dissolution is appropriate where, like here, the two members here have stopped interacting and are instead engaged in litigation to resolve the disputes, further demonstrating the need for judicial dissolution.[43]

Respondents point to the fact that the Company can sell its current inventory and continue operating for a time.[44] But the existence of some ongoing business does not preclude a finding of deadlock.[45] Respondents also argue that the

---

[42] *Haley*, 864 A.2d at 88–89 (holding that dissolution is appropriate where 50/50 members of an LLC involved in creating a business for their mutual benefit and profit were deadlocked about the business strategy and future of the LLC).

[43] *Id.* at 96.

[44] In the Derivative Action, RLC acknowledges that T&S's refusal to sell lumber to the Company prevents the Company from fulfilling its purpose and continuing to operate. *See* Verified Complaint Asserting Breach of Fiduciary Duty ¶ 62, *Robinson Lumber Co.*, C.A. No. 2022-0423-MTZ (Del. Ch. May 13, 2022) (D.I. 1) ("The Company was purposefully built to purchase and process lumber only from T&S Inc. and cannot make 'open market' purchases of raw material. . . . [T&S and Thompson] possess several means to functionally deny the Company from purchasing any lumber at all, posing a very real threat of driving the Company into insolvency.").

[45] *Fisk Ventures*, 2009 WL 73957, at *4 (explaining this Court has found dissolution appropriate even where the LLC was still receiving rent checks and paying a mortgage because the Company's activity was "purely residual, inertial status quo") (citing *Haley*, 864 A.2d at 91, 96).

informational asymmetry Petitioners complain of is not new: the Company has always operated with RLC and Robinson in charge of the Company's books and records.[46] But Petitioners allege a new level of asymmetry, accusing Respondents of ceasing to provide information about the Company's finances, and terminating T&S's viewing access to the Company's bank and loan accounts. Far from being business as usual, these allegations reflect a continuing breakdown in the members' and managers' relationships. The Petition adequately alleges the managers are deadlocked.

### 2. As Pled, It Is Not Reasonably Practicable To Carry On The Business In Conformity With The Parties' Agreements.

Respondents also argue the Petition should be dismissed because T&S "does not adequately allege that is it not reasonably practicable to carry on the business of the company in conformity with the LLC Agreement."[47] Respondents point to the language in the LLC Agreement stating the Company's purpose is "to engage in *any lawful activities* for which limited liability companies may be formed under the Act," and asserts this broad purpose has not been frustrated.[48] This technical argument fails in the face of the JV Agreement and other evidence that the Company's purpose

---

[46] MTD RB at 7–9.

[47] MTD OB at 13–18; *see also* MTD RB at 14–16.

[48] MTD OB at 16 (quoting LLC Agr. § 1.3).

is to buy lumber from T&S and sell it to RLC and other third parties.  The Petition alleges it is not reasonably practicable to carry on this business.

Judicial dissolution is appropriate "where the defined purpose of the entity was fulfilled or impossible to carry out."[49]  "When analyzing purpose, the Court looks to the parties' foundational contractual agreement and asks whether it is reasonably practicable to carry on the business in line with that purpose, not whether 'the purpose . . . has been completely frustrated.'"[50]  While the purpose clause in an organizational document provides evidence of an LLC's purpose, other additional evidence may be used to inform the analysis.[51]  The analysis should not be limited to the purpose clause of an LLC agreement where doing so would resolve the dispute on a technicality.[52]

The LLC Agreement's purpose clause is broad, stating the Company's purpose is "to engage in *any lawful activities* for which limited liability companies

---

[49] *Meyer Nat. Foods*, 2015 WL 3746283, at *3 (quoting *In re Seneca Invs. LLC*, 970 A.2d 259, 262–63 (Del. Ch. 2008) (footnote omitted)).

[50] *Id.* (quoting *Fisk Ventures*, 2009 WL 73957, at *4 (internal quotation marks omitted)).

[51] *See id.* (explaining, under this Court's precedent, "the purpose clause is of primary importance, but other evidence of purpose may be helpful as long as the Court is not asked to engage in speculation").

[52] *Id.*

may be formed under the Act."[53]  But the JV Agreement provides that the parties entered into it "[t]o induce [the Company], RLC and T&S to enter into the LLC Agreement."[54]  The LLC Agreement is subordinate to the JV Agreement in this way.[55]  And the JV Agreement lays out logistics related to T&S's provision of lumber to the Company and RLC's ability to purchase that lumber, making clear that the Company's purpose was to buy lumber from T&S and sell it to RLC and third parties.[56]  Indeed, Respondents have recognized that the failure of the Company to pay T&S for lumber sold to the Company and T&S's corresponding refusal to continue to sell lumber to the Company "eliminate[s] the entire purpose of the [j]oint [v]enture."[57]

The Company's purpose was to operate a joint venture between T&S and RLC, based on a supply and distribution arrangement of lumber between T&S and

---

[53] LLC Agr. § 1.3 (emphasis added).

[54] JV Agr., Recital C.

[55] *Simon v. Navellier Series Fund*, 2000 WL 1597890, at *7–8 (Del. Ch. Oct. 19, 2000) (explaining agreements entered into contemporaneously must be viewed together and in their entirety and finding that an indemnification agreement is subordinate to a declaration of trust where the indemnification agreement was entered into because of the declaration of trust).

[56] JV Agr. §§ 3.2, 3.3.

[57] Pet. ¶ 50; Verified Complaint Asserting Breach of Fiduciary Duty ¶ 40, *Robinson Lumber Co.*, C.A. No. 2022-0423-MTZ (Del. Ch. May 13, 2022) (D.I. 1).

the Company. Because the Company is not paying T&S, T&S will no longer provide the Company with lumber. Petitioners have made a prima facie case for dissolution.[58]

### 3. The LLC Agreement Does Not Offer An Exit Mechanism That Precludes Dissolution.

Respondents contend the LLC Agreement's Buy-Sell Purchase Option requires dismissal of the petition because it offers an exit mechanism that resolves the deadlock.[59] Respondents point to the Buy-Sell Purchase Option in Article VIII of the LLC Agreement as a valid exit mechanism, requiring dismissal of this action. The Buy-Sell Purchase Option provides,

> Each Member shall have the right . . . to give written notice to any other Member offering to purchase all of the Membership Interest owned by the other Member or to sell all of his or her Membership Interest to the other Member in accordance with the procedures in this Article VII.[60]

After receiving the notice, the non-offering member may elect to either sell all of its membership interest to the offering member or to buy all of the offering member's

---

[58] *Meyer Nat. Foods*, 2015 WL 3746283, at *5; *see also In re Silver Leaf*, 2005 WL 2045641, at *11 (finding a company as formed for the specific purpose of making Tasty Fries vending machines and that the purpose was frustrated when that opportunity no longer existed).

[59] MTD OB at 14 n.7; MTD RB at 9–14.

[60] LLC Agr. § 8.1

membership interests, at the price and upon the other terms and conditions specified in the notice.[61]

Respondents are correct that "the presence of a reasonable exit mechanism bears on the propriety of ordering dissolution under 6 *Del. C.* § 18-802."[62] In deciding whether Petitioners have pled a claim for dissolution, I must consider whether a viable exit mechanism exists.[63] The exit mechanism must also be equitable in its operation.[64] That is, "[t]o obtain dismissal of a petition for judicial dissolution based on a contractual exit plan, however, the movant must demonstrate,

---

[61] *Id.* at § 8.3.

[62] *Seokoh, Inc. v. Lard-PT, LLC*, 2021 WL 1197593, at *12 (Del. Ch. Mar. 30, 2021) (quoting *Haley*, 864 A.2d at 96).

[63] *Id.* at *10 (citing *Haley*, 864 A.2d at 96).

[64] *See Haley*, 864 A.2d at 95 ("[T]he presence of a reasonable exit mechanism bears on the propriety of ordering dissolution under 6 *Del. C.* § 18-802. When the agreement itself provides a fair opportunity for the dissenting member who disfavors the inertial status quo to exit and receive the fair market value of her interest, it is at least arguable that the limited liability company may still proceed to operate practicably under its contractual charter because the charter itself provides an equitable way to break the impasse."); *Seokoh*, 2021 WL 1197593, at *8 (explaining this Court "has emphasized that a judicial decree of dissolution is typically inappropriate when the entity's constitutive documents provide an *equitable and effective* means of overcoming the deadlock." (citations omitted) (emphasis supplied)); *Vila*, 2010 WL 3866098, at *8 ("Of course, the existence of a deadlock would not necessarily justify a dissolution if the LLC Agreement provided a means to resolve it *equitably*." (citations omitted) (emphasis added)).

as a matter of law, that the exit mechanism 'can actually extract [the parties] fairly.'"[65]

Respondents rely on *In re Doehler Dry Ingredient Solutions, LLC*[66] to argue the Buy-Sell Provision is a valid exit mechanism.[67] The LLC agreement in that case also provided a buy-sell option that, upon exercise by one member, triggered an obligation in the non-offering members to either purchase the offering member's units or sell their own. But importantly, the buy-sell provision in *In re Doehler* was mandatory "in the event that the Members become deadlocked with respect to any decision that materially and adversely affects the Corporation's business as a result of their dispute."[68]

Here, the Company's Buy-Sell Provision is optional at all times, even in the case of deadlock. The LLC Agreement does not force a buyout of any member upon deadlock. Instead, it gives each member an option that it may exercise at any time— or not.[69] As this Court explained in *Fisk Ventures, LLC v. Segal*, "[i]t would be inequitable for this Court to force a party to exercise its option when the party deems

---

[65] *Seokoh*, 2021 WL 1197593, at *12 (citing *Haley*, 864 A.2d at 96).

[66] 2022 WL 4281841 (Del. Ch. Sept. 15, 2022).

[67] MTD RB at 10–11.

[68] *In re Doehler*, 2022 WL 4281841, at *8.

[69] *Fisk Ventures*, 2009 WL 73957, at *5.

it in its best interest not to do so."[70]  The Buy-Sell Purchase Option does not provide an exit mechanism that the parties agreed, ex ante, would resolve their deadlock. They simply agreed either member could exercise the option if and when it suited that member.

Finally, the Buy-Sell Purchase Option would not allow Thompson to separate himself from the Company.  In *Haley v. Talcott*, even though the exit mechanism allowed a member to sell his interest to the other member at fair market value, this Court found the exit mechanism was not equitable because the member would continue to be personally liable on a bank guaranty.[71]  Because the leaving member "would still be left holding the bag on the guaranty," this Court determined it would be inequitable to force the member to use the exit mechanism in this circumstance and, therefore, it was not an adequate remedy.[72]  Similarly, here, even if the Court were to force T&S and Thompson to exercise its option in the Buy-Sell Provision, Thompson would still be personally liable as a guarantor on the Company's credit agreement.  That is, the Buy-Sell Provision is not an adequate remedy at law because it will not "equitably effect the separation of the parties" as it could leave Thompson

---

[70] *Id.*

[71] 864 A.2d at 97–98.

[72] *Id.*

as a departing member "with no upside potential, and no protection over the considerable downside risk" of having to cure any default by the Company.[73]

In sum, it would be inequitable and against the contract language to force the parties to engage in the optional Buy-Sell Provision, so it does not foreclose dissolution.[74]

### B.    The Delaware Actions Are Consolidated.

In the alternative, Respondents argue this case should be stayed in favor of the first-filed Derivative Action and Georgia Action, which they contend require the settlement of the same factual and legal questions at issue in the petition.[75] Petitioners oppose any stay of this action. The Court shares Respondents' concerns to some extent and recognizes the extensive factual overlap between the cases—

---

[73] *Id.* at 98.

[74] The fact the parties are deadlocked and there is no mechanism in the LLC Agreement to resolve the deadlock also provides another reason the parties cannot operate the Company in conformity with the LLC Agreement. *See Vila*, 2010 WL 3866098, at *7 ("[W]hen an LLC agreement requires that there be agreement between two managers for business decisions to be made, those two managers are deadlocked over serious issues, and the LLC agreement provides no alternative basis for resolving the deadlock, it is not 'reasonably practicable' to continue to carry on the LLC business 'in conformity with [its] limited liability company agreement.'" (second alteration in original) (citations omitted)).

[75] MTD OB at 18–22; MTD RB at 23–26.

especially the two Delaware cases. Petitioners acknowledged this overlap and risk of inconsistent factual findings.[76]

As a result of these concerns and the discussion at the hearing, the Court proposed that in lieu of a stay, the Delaware actions be consolidated.[77] The parties agreed consolidation would be both efficient and appropriate given the unique circumstances of the case.[78] Because the parties agree consolidation is an appropriate way to address the concerns underlying Respondents' request to stay, I deny this portion of Respondents' motion. I will consolidate this case with the Derivative Action and provide the parties with an opportunity to propose a schedule and amend any pleadings as necessary, including requesting dissolution as relief.

## III. CONCLUSION

For the foregoing reasons, the motion is **DENIED**. Additionally, this case will be consolidated with *Robinson Lumber Company, Inc. v. Thompson*, No. 2022-0423-MTZ (Del. Ch.). The parties should confer on a schedule to proceed in that case.

---

[76] D.I. 27 at 61.

[77] *Id.* at 78–82.

[78] *Id.* at 79, 82.

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor


MTZ/ms

cc: All Counsel of Record, via *File & ServeXpress*