**ALTA BERKELEY VI C.V., Alta Berke-
ley VI S by S C.V., and Kiwi II Ventu-
ra Serviços De Consultoria, S.A.,
Plaintiffs Below, Appellants,**

v.

**OMNEON, INC., Defendant
Below, Appellee.**

**No. 442, 2011.**

Supreme Court of Delaware.

Submitted: Jan. 25, 2012.

Decided: March 5, 2012.

---

**49.** *Cooke v. State,* 977 A.2d 803 (Del.2009).

**50.** Trial Tr. 19, Feb. 16, 2011.

Norman M. Monhait (argued), Jeffrey S. Goddess and Jessica Zeldin, Esquires, of Rosenthal Monhait & Goddess, P.A., Wilmington, Delaware;  for Appellants.

Peter J. Walsh, Jr. (argued) and Matthew F. Davis, Esquires, of Potter Anderson & Corroon LLP, Wilmington, Delaware;  Of Counsel: Douglas J. Clark, Thomas J. Martin and Bryan J. Ketroser, Esquires, of Wilson, Sonsini, Goodrich & Rosati, Palo Alto, California;  for Appellee.

Before BERGER, JACOBS and RIDGELY, Justices.

JACOBS, Justice:

The appellants, plaintiffs-below (referred to herein as "appellants" or "Series C–1 preferred shareholders"), held Series C–1 preferred shares in Omneon, Inc., a Delaware corporation ("Omneon").[1] The appellants held their Series C–1 preferred shares until September 15, 2010, when those shares were "automatically" (*i.e.,* involuntarily) converted into Omneon common stock by a majority vote of Omneon's preferred shareholders (the "conversion"), other than the Series A–2.2 preferred. The conversion was a condition of, and occurred "immediately prior to" a merger

---

**1.** The appellants are two affiliated investment partnerships organized under Dutch law ("Alta Berkeley"), plus a corporation organized under Portuguese law ("Kiwi").

of Omneon with Orinda Acquisition Corp. ("Orinda"), an entity controlled by the ultimate acquirer, Harmonic, Inc. ("Harmonic"), also a Delaware corporation.

Claiming that the forced conversion of their shares was unlawful, the Series C-1 preferred shareholders sued Omneon in the Superior Court for breach of contract. Those shareholders, as plaintiffs, claimed that, because the conversion of their preferred shares was integral to Harmonic's acquisition of Omneon, the conversion was part of a "Liquidation Event" under Omneon's certificate of incorporation,[2] that entitled the Series C-1 preferred shareholders to the liquidation "preference" payable for their shares.[3] For every series of Omneon preferred stock *except for* Series A-2.2 and Series C-1, the liquidation preference amount was less than the merger consideration value that Omneon's shareholders would receive from Harmonic.[4] For the Series C-1 preferred shareholders, the liquidation preference would have exceeded the estimated merger consideration by about $5.5 million.[5] Accordingly, the Series C-1 preferred shareholders claimed entitlement to damages equal to the difference in amount between their liquidation preference and the merger consideration that they actually received.

The Superior Court granted summary judgment in favor of Omneon, holding that under the plain language of Omneon's cer-

tificate of incorporation, only one series of preferred stock—the Series A-2.2—was legally entitled to a liquidation preference payout. The Series C-1 preferred shareholders were not entitled to a liquidation preference payout, the court ruled, because the Series C-1 preferred shares had been validly converted into common stock before the Omneon–Orinda merger took place. We agree and conclude that the conversion was not part of a "Liquidation Event" as defined by Omneon's charter. Therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Omneon is a privately-held technology company headquartered in Sunnyvale, California. Harmonic is a publicly-held technology company, also headquartered in Sunnyvale, whose shares trade on the NASDAQ.

On May 6, 2010, Omneon and Harmonic entered into a merger agreement (the "merger agreement"), under which Harmonic would acquire Omneon in a triangular merger involving a Harmonic-controlled entity, Orinda.[6] The merger agreement relevantly provided that: (1) the Series A-2.2 preferred would receive its approximately $1.5 million liquidation preference as Omneon's charter required;

---

**2.** Article 4(B)(2)(b) of the Certificate of Incorporation of Omneon, Inc., State of Delaware, Division of Corporations (as restated Dec. 5, 2007).

**3.** *Id.* at Article 4(B)(2)(a).

**4.** *Id.* at Article 4(B)(2)(a)(i). Four of the nine Series of preferred were not entitled to any liquidation preference payment.

**5.** *Id.* The value of the merger consideration, consisting of roughly 60% cash and 40% Harmonic stock, was estimated at $11.10 per share by the Superior Court. If the liquidation payment was required, the Series C-1

preferred shareholders would have been entitled to a distribution of $28.78 per share. Because those Series C-1 preferred shareholders owned 311,970 shares, according to their complaint, the liquidation payment exceeded by over $5.5 million the value of the merger consideration they received.

**6.** The merger agreement contemplated that a second merger with another Harmonic acquisition vehicle would occur thereafter. For reasons not relevant to this appeal, that second merger did not occur.

(2) the merger would not be consummated unless, and not until after, the remaining preferred shareholders approved, by majority vote, an "automatic" conversion of their preferred shares into common stock;[7] (3) after the conversion, Orinda would be merged into Omneon; and (4) as consideration for their Omneon shares, Omneon's (post-conversion) common shareholders would receive, in total, roughly $190 million in cash plus $120 million in Harmonic stock.

Because Harmonic had also entered into "lockup" voting agreements with a majority of Omneon's shareholders—including a majority of the preferred shareholders—the approval of both the conversion and the merger were assured. The preferred share conversion was completed on September 15, 2010, and the merger was consummated later that same day.[8] The Series C–1 preferred shareholders filed their Superior Court complaint on November 10, 2010, seeking damages equal to the difference between their liquidation preference and the merger consideration they received following the conversion and merger.

Before the trial court, the Series C–1 preferred shareholders claimed that they were entitled to their liquidation preference payout, because the conversion was a part of a "Liquidation Event" as defined in the Omneon certificate of incorporation.[9] All parties agree that under the applicable Omneon charter provision, the merger was a Liquidation Event that would entitle every Series of preferred to its respective liquidation preference.[10] The Series C–1 preferred shareholders claimed that because the conversion was related and integral to the merger, the conversion was therefore part of a "Liquidation Event." The Superior Court rejected that claim, and ruled that only the merger—but not the antecedent conversion—was a Liquidation Event. Because the conversion preceded the merger, the Series C–1 shareholders were common stockholders at the time of the Liquidation Event (the merger), and as such were not entitled to a liquidation preference payment.

In reaching that result, the Superior Court also considered a separate Omneon charter provision (the "provided, however provision") that expressly allowed only one Series—the Series A–2.2 preferred—to "opt out" of an "automatic" conversion in specified circumstances, including the circumstances of this case.[11] Having exercised its exclusive right to opt out of the conversion, the Series A–2.2 was the only Series entitled to a liquidation payment upon the merger. To allow the Series C–1

7. By agreeing to the conversion, the preferred shareholders would forego their contractual right to any liquidation preference payout that would otherwise be triggered by the merger.

8. After the Omneon–Harmonic merger agreement was signed in May 2010, but before the merger was consummated, Harmonic sought approval from the California Department of Corporations to issue and sell securities required to complete the Omneon merger. Alta Berkeley objected to the fairness of the proposed transaction, arguing that it was owed its liquidation preference payout. A fairness hearing was held by the California Department officials on July 19, 2010. Ultimately, those officials approved the transaction on the ground that, under Omneon's charter, only the Series 2.2 shareholders were entitled to receive a liquidation payout. California officials later issued a permit to Harmonic to issue the securities to be used as part of the merger consideration.

9. Article 4(B)(2)(b) of the Certificate of Incorporation of Omneon, Inc., State of Delaware, Division of Corporations (as restated Dec. 5, 2007).

10. *Id.* at Article 4(B)(2)(a).

11. *Id.* at Article 4(B)(3)(b). *See infra* notes 35–40 and accompanying text.

preferred shareholders also to recover their liquidation preference, the court held, would effectively read the "provided, however" provision out of the Omneon charter. The trial court granted summary judgment for Omneon, and this appeal followed.

## ANALYSIS

On appeal, the Series C–1 preferred shareholders claim that the Superior Court erred in holding that the conversion was not a part of a "Liquidation Event," that would trigger their contractual entitlement to a liquidation preference payment. The appellants rely upon Omneon's admission that the conversion was "related and integral" to the merger that indisputably constituted a Liquidation Event. They claim that the conversion was necessarily a part of that Liquidation Event, because it was one of a "series of related transactions" that constituted that "event." Therefore, the conversion fell within the Omneon charter's Liquidation Event definition.

Any entitlement that appellants may have to a liquidation preference must derive from the provisions of the certificate of incorporation that created those preferential rights.[12] In this case, it is undisputed that under the Omneon charter, a "Liquidation Event" must occur to trigger the right of the Series C–1 preferred to a liquidation preference payment. It is also undisputed that "Liquidation Event" includes, without limitation, any "reorganization, merger, or consolidation" that transfers a control bloc from Omneon's shareholders to the acquirer. The sole issue, therefore, is whether the antecedent conversion constituted, or was a part of, a "Liquidation Event" as defined by Omneon's charter.

■■■■ Certificates of incorporation are regarded as contracts between the shareholders and the corporation, and are judicially interpreted as such.[13] A judicial interpretation of a contract presents a question of law that this Court reviews de novo.[14] Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning.[15] Contract language is not ambiguous merely because the parties dispute what it means.[16] To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning.[17] Further, "[i]t is well established

---

**12.** 8 Del. C. § 151(a) ("Every corporation may issue 1 or more classes of stock … [with such] … *preferences … as shall be stated … in the certificate of incorporation* or of any amendment thereto [or by board resolution if expressly allowed by the charter]") (italics added); *Elliott Assoc., L.P. v. Avatex Corp.,* 715 A.2d 843, 853 n. 46 (Del.1998) ("Stock preferences must … be clearly expressed and will not be presumed.") (citation omitted).

**13.** *Airgas, Inc. v. Air Prod. and Chem., Inc.,* 8 A.3d 1182, 1188 (Del.2010) (citing *Centaur Partners, IV v. Nat'l Intergroup, Inc.,* 582 A.2d 923, 928 (Del.1990)).

**14.** *Airgas,* 8 A.3d at 1188.

**15.** *City Investing Co. Liq. Trust v. Cont'l Cas. Co.,* 624 A.2d 1191, 1198 (Del.1993) ("If a writing is plain and clear on its face, *i.e.,* its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent.") (citation omitted).

**16.** *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.,* 693 A.2d 1059, 1061 (Del.1997).

**17.** *GMG Cap. Invest., LLC v. Athenian Venture Part. I, L.P.,* 36 A.3d 780 (Del.2012). *See also Rhone–Poulenc Basic Chem. Co. v. Am. Motor. Ins. Co.,* 616 A.2d 1192, 1196 (Del.1992) ("[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.") (citation omitted).

that a court interpreting any contractual provision, including preferred stock provisions, must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." [18]

We conclude that under the plain meaning of Omneon's unambiguous charter language, the Superior Court ruled correctly, for two reasons. First, the "automatic" (*i.e.,* forced) conversion was not a part of a Liquidation Event, because the conversion was not (as the Omneon charter required) a transaction in which Harmonic, or a related entity or Harmonic shareholders acquired Omneon, or voting power in Omneon. Second, the conversion preceded the merger which, we find, was the only transaction constituting a Liquidation Event. It follows, therefore, that the Series C–1 preferred shareholders were common stockholders at the time of the Liquidation Event, and as such were no longer entitled to any liquidation preference payment.

## A. The Omneon Charter's "Liquidation Preference" Framework

Omneon's pre-merger capital structure was somewhat complex, as it included nine different Series of preferred stock, spread across three preferred classes (Classes A, B, and C). Article (4)(B)(2)(a) of the Omneon charter (entitled "Liquidation Preference") stated that "[i]n the event of any voluntary or involuntary liquidation . . . . distributions to the stockholders of the Company shall be made in the following manner." Following that statement, in subsection (i), was a list of specific per share liquidation dollar amounts that vary depending on which Series of preferred

stock is implicated.[19] Of the nine Series of preferred, only two (the Series C–1 and the Series A–2.2) were entitled to a liquidation preference distribution that exceeded the consideration being paid by Harmonic in the merger.[20] The Series C–1 liquidation preference payout was nearly $29 per share, and the Series A–2.2 was far greater—$1,513,032.40 per share.

Two provisions of Omneon's certificate of incorporation are material to resolving this dispute. The first is Article 4(B)(2)(b) (the "Liquidation Event clause"), upon which the appellants primarily rely. Article 4(B)(2)(b) defines what constitutes a "Liquidation Event" that would entitle the preferred shareholders to a liquidation preference distribution under Article 4(B)(2)(a). Article 4(B)(2)(b) relevantly provides:

(b) *Liquidation Event* . . . a liquidation shall be deemed to be occasioned by, or to include, (i) the acquisition of the Company by any person or entity *by means of any transaction or series of related transactions* by the Company or its stockholders in which the stockholders of the Company immediately prior to such transaction or series of related transactions own less than 50% of the Company's voting power immediately after such transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation . . . .); (ii) the closing of the transfer (whether by merger, consolidation or otherwise), *in one transaction or a series of related transactions,* by stockholders of the Company to a person or group of affiliated persons . . . of the Company's then outstanding securities

---

**18.** *Elliott Assoc., L.P. v. Avatex Corp.,* 715 A.2d 843, 854 (Del.1998).

**19.** Article 4(B)(2)(a)(i) of the Certificate of Incorporation of Omneon, Inc., State of Dela-

ware, Division of Corporations (as restated Dec. 5, 2007).

**20.** Four Series had no liquidation preference right at all.

if, after such closing, such person or group ... would hold 50% or more of the outstanding voting stock of the Company.... [21]

The Series C–1 preferred shareholders claim that the conversion was part of a "series of related transactions" that culminated in the merger—*i.e.,* in the "Liquidation Event" described in subsections (i) and (ii) of Article 4(B)(2)(b). Because the conversion constituted a "part" of the Liquidation Event (the argument goes), the Series C–1 preferred shares were not converted at the time of the Liquidation Event and, accordingly, were entitled to their liquidation preference payment under Article (4)(B)(2)(a).

Omneon responds, and the Superior Court found, that the conversion was not part of a "series of related transactions" that constituted a Liquidation Event. Only the merger constituted a Liquidation Event. Because the conversion took place before the merger, at the time of the merger the Series C–1 preferred shareholders held only common stock that had no "liquidation preference" rights.

To support its position, Omneon points to a separate charter provision (the "provided, however provision"), that is found in Article 4(B)(3)(b) of the charter. Clause (B)(3)(b) authorizes, by majority vote of the preferred shareholders, an "automatic" conversion of all preferred shares into common stock, as follows:

> (b) *Automatic Conversion.* Each share of Preferred Stock shall automatically be converted into ... Common Stock ... upon ... (2) ... the election of the holders of a majority of the outstanding shares of such Preferred Stock voting together as a single class on an as-converted to common stock basis and

not as separate series; *provided, however, in the event that such conversion is conditioned upon or follows consummation of a Liquidation Event ... then, solely with respect to the Series A–2.2 Preferred Stock,* the election of the holders of a majority of the outstanding shares of the Series A–2.2 Preferred Stock (and the holders of all other series of Preferred Stock would then vote together excluding the Series A–2.2 Preferred Stock).[22]

Importantly, the "provided, however" provision excepts or "carves out" only one Series—the Series A–2.2 preferred—from "automatic" or forced conversion. That is, under the "provided, however" provision, only the Series A–2.2 preferred is entitled to "opt out" of any conversion vote and thereby preserve its contractual right to a liquidation preference distribution. The Superior Court found that if a conversion immediately preceding a merger were deemed a part of a Liquidation Event (as the appellants argued), then all Series of preferred would effectively have the same "opt out" right as the Series A–2.2. That interpretation would ignore the limited scope of the "provided, however" provision and thereby render it "superfluous." For the reasons next discussed, we agree with the Superior Court's reasoning and the result it reached.

### B. The Conversion Was Not a Liquidation Event "Transaction"

■ For the appellants to prevail, the conversion must either constitute, or be a part of, a "Liquidation Event" within the meaning of the Omneon charter. Under Article 4(B)(2)(b) of the Omneon certificate, a Liquidation Event is "deemed" to occur upon: (1) an "acquisition" in which

---

**21.** Italics added.

**22.** Italics added.

the acquirer[23] obtains majority voting power "by means of any transaction or series of related transactions" [subsection (b)(i) ] *or* (2) the closing of the transfer of a majority of voting stock to an acquirer "in one transaction or a series of related transactions" [subsection (b)(ii) ]. Even under the appellants' proffered interpretation, for the conversion to fall within the definition of Liquidation Event it must—as the Series C–1 preferred shareholders argue—be part of a "series of related transactions" as described in that definition, to constitute a part of a "Liquidation Event." That argument cannot withstand scrutiny.

Both the (b)(i) and (b)(ii) charter provisions plainly refer only to "transactions" that involve an acquirer that gains some incremental "voting power" or stock in each component transaction, and that eventually obtains (for itself or its shareholders) majority voting power at the completion of the "series."[24] The (b)(i) provision describes a person or entity's *acquisition of Omneon "by means of* any transaction [or series of transactions] ... *in which* " a bloc of majority voting power is transferred from Omneon's shareholders.[25] The (b)(ii) provision similarly requires a "transfer" of a majority of voting stock *"to* " the acquirer *"in* a transaction [or series of transactions]."[26] The Series C–1 shareholders do not claim that subsection (b)(i)'s description of an acquisition *"by means of* " a series of related transactions has a meaning different from subsection (b)(ii)'s reference to a voting stock transfer occurring *"in* " a series of related transactions.[27]

■ A fatal flaw in the appellants' argument is that the acquirer, Harmonic, did not acquire Omneon or *any* part of its stock (including voting power), let alone majority voting power, in the conversion. Indeed, Harmonic was not an Omneon preferred shareholder at the time of the conversion, and Harmonic did not participate in the conversion. "Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty."[28] Here, the plain language of the Omneon charter makes inescapable the conclusion that Harmonic's acquisition of Omneon occurred "in," and was "by means of," the merger "transaction"—not "in" or "by means of" the conversion.

Faced with the insurmountable obstacle created by the charter language, the Series C–1 preferred shareholders seek refuge in a fallback position. They argue that even if the conversion did not, in and of itself, constitute a Liquidation Event, it was a part (or element) of the Liquidation

---

23. In this Opinion, general references to an "acquirer" are intended to refer to an acquiring corporation, its shareholders or related subsidiaries, entities and affiliates.

24. *Id.* We note that subsection (b)(i) uses the phrase "voting power," whereas subsection (b)(ii) refers to "outstanding voting stock." Whatever possible difference exists between these terms is not before us in, nor relevant to, this appeal.

25. *Id.* (italics added). The phrase "by means of" is an idiomatic expression in which the word "means" refers to "an action or system by which a result is achieved." American

Heritage Dictionary (defining "by means of" as "with the use of; owing to"); Oxford Dictionaries (defining "means" as "an action or system by which a result is achieved; a method").

26. Article 4(B)(2)(b) of the Certificate of Incorporation of Omneon, Inc., State of Delaware, Division of Corporations (as restated Dec. 5, 2007) (italics added).

27. *Id.* (italics added).

28. *Rhone–Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

Event, because the conversion was one of a "series of related transactions" that culminated in the merger. We disagree, because no reasonable interpretation of the Liquidation Event clause's "series of related transactions" language can justify stretching it that far. To do so would transmute the preferred shareholders' performance of an antecedent condition of the merger (the conversion)[29] into a Liquidation Event transaction where Harmonic acquired Omneon (the merger itself). Although those two events were "related" sequentially and factually, they cannot be fused together so as to become "related" legally, and thereby made part of the same Liquidation Event "series." Any such construction would do violence to the plain language and the underlying intent of clauses b(i) and b(ii), both of which envision aggregating only transactions that transfer voting power from Omneon's shareholders to a third party. Harmonic played *no* role, and it received *no* voting power, in the conversion. The only actors who played any role in the conversion were the preferred shareholders, a majority of whom approved it.

Our analysis of this issue is informed by *Bank of New York Mellon Trust Co. v.* *Liberty Media Corp.*[30] In that case, we (and both parties to that dispute) described the contractual phrase "series of transactions" as intended to prevent "accomplishing piecemeal ... what is specifically precluded if attempted as a single transaction."[31] *Liberty Media* involved a different legal issue—whether, on the facts of that case, a transaction could be aggregated with earlier transactions to constitute a sale of "substantially all" of a corporation's assets within the meaning of a boilerplate indenture clause governed by New York law. Although it does not cite *Liberty Media* specifically, Omneon essentially argues that the "series of related transactions" language here carries the same meaning ascribed to nearly identical language[32] in *Liberty Media.* That is, Omneon argues that "series of related transactions" is anti-circumvention language, intended to prevent Omneon and Harmonic from evading the Liquidation Event definition (and, consequently, avoiding an otherwise mandated liquidation preference payment), such as by a "creeping" acquisition.[33]

We agree. Without that "series" language, the literal requirements for a Liq-

---

**29.** Among the other "conditions" expressly detailed in the merger agreement were: (i) stockholder approval; (ii) that all "representations and warranties" made remained materially true on the closing date; (iii) the execution of certain waivers regarding "parachute payments"; (iv) the termination of certain Omneon contracts; and (v) retention of a pre-specified number of Omneon employees. Agreement and Plan of Reorganization, By and Among Harmonic Inc., Orinda Acquisition Corp., Orinda Acquisition, LLC, Omneon, Inc., and Shareholder Representative Services LCC, as representative (May 6, 2010).

**30.** 29 A.3d 225 (Del.2011).

**31.** *Id.* at 241–42 (citation and italics omitted).

**32.** The phrase here includes the word "related," whereas in *Liberty Media* it did not. *Id.* at 229.

**33.** Specifically, Omneon posits that the "series of related transactions" language is intended to "captur[e] a group of transactions which, individually, do not result in the change of 50% of Omneon's stock, but which do effect such a change when considered together." The merger, Omneon notes, "by itself suffices to trigger a Liquidation Event," and thus the conversion "was not ... a part of the Liquidation Event." *Cf. Liberty Media*, 29 A.3d at 241 (stating that both parties acknowledged "that the 'series of transactions' language in [an] Indenture [was intended to guard against] the risks posed by the 'piecemeal' disposition of assets through 'a series of transactions.' ").

uidation Event to occur could easily be circumvented by, for example, acquiring majority voting stock in two discrete share purchases—a 49% stake in the first transaction followed by a 2% position in a second transaction. Unless the two purchases are considered together as one, neither "transaction," viewed in isolation, would qualify as a Liquidation Event. We conclude that here, Omneon's Liquidation Event clause employs the "series" language for an anti-circumvention purpose. The Series C–1 preferred shareholders have proposed no reasonable alternative reading of "series of related transactions," nor do they claim that Omneon or Harmonic inequitably employed the conversion to evade the occurrence of (and the legal consequences flowing from) a Liquidation Event.[34]

### C. *Only the Series A–2.2 Was Entitled to "Opt Out" of the Conversion*

The "provided, however" provision confirms the validity of the foregoing analysis, by giving effect to "all terms" of the Omneon charter, as our rules of contract construction require.[35] The "provided, however" provision expressly gave the Series A–2.2 preferred the exclusive right to "opt out" of a conversion that is either (i) "conditioned upon," or (ii) that "follows" the

"consummation of a Liquidation Event."[36] No other Series of preferred was given that right. It is undisputed that the merger, standing alone, was a Liquidation Event under the charter definition.[37] It is also undisputed that the conversion was a (waivable) condition of the merger, having been so described in the Harmonic–Omneon merger agreement.[38] Moreover, Omneon has represented, and the Series C–1 preferred shareholders have not disputed, that the merger was also a condition of the conversion. Therefore, the conversion was "conditioned upon" a Liquidation Event (the merger)—a circumstance that triggered the Series A–2.2 preferred's right to "opt out" of the conversion.

The Superior Court determined, and we agree, that the "provided, however" provision would be "superfluous" if the Series C–1 preferred shareholders were entitled to the same "opt out" right as the Series A–2.2 under the Liquidation Event clause.[39] The drafters of these provisions plainly considered the possibility that a conversion might be integral to, and precede, a Liquidation Event—but that those two transactions would nonetheless constitute legally separate events ("transactions"). Here, all but two of the relevant Series of preferred had the requisite eco-

---

**34.** Article 4(B)(2)(b) of the Certificate of Incorporation of Omneon, Inc., State of Delaware, Division of Corporations (as restated Dec. 5, 2007). Nor is it obvious how they could have, because only the preferred shareholders (and neither Omneon, nor Harmonic) were entitled to a vote on the conversion.

**35.** *Elliott Assoc., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del.1998).

**36.** Article 4(B)(3)(b) of the Certificate of Incorporation of Omneon, Inc., State of Delaware, Division of Corporations (as restated Dec. 5, 2007).

**37.** *Id.* at Article 4(B)(2)(b).

**38.** Art. VII (entitled "Conditions to the merger"). Agreement and Plan of Reorganization, By and Among Harmonic Inc., Orinda Acquisition Corp., Orinda Acquisition, LLC, Omneon, Inc., and Shareholder Representative Services LCC, as representative (May 6, 2010).

**39.** Specifically, the Superior Court observed that the provided, however clause "sets the Series A2.2 preferred shareholders [sic] apart from all other preferred shareholders ... [and any] other reading of that provision would ... leave the Series A–2.2 Preferred Stockholders [sic] to scratch its head and wonder exactly what it had bargained for."

nomic motivation (the merger premium) to approve the conversion. That is, the Harmonic merger gave all but two of the nine Series of preferred an incentive to convert—an incentive made possible only because of the preexisting "automatic" conversion charter mechanism.[40] Only the Series A–2.2 preferred bargained for the right to avoid that automatic conversion possibility and thereby protect its entitlement to receive a liquidation preference payout, even if the other Series decided (by majority vote) to forego it. The Series C–1 preferred did not bargain for or obtain that contractual "opt out" right. They cannot now obtain from the courts a right that they failed to achieve at the bargaining table.

### D. The C–1 Preferred Held Common Stock At the Time of the "Liquidation Event"

Finally, and to reiterate, under the charter, Omneon's preferred shareholders were entitled to their liquidation preference "*[i]n the event of*"—not *before*—"any ... liquidation ... of the Company."[41] Here, only the merger constituted a cognizable Liquidation Event under the charter definition, and the merger occurred *after* the conversion. To be entitled to their liquidation preference payment, the preferred shareholders would have to have been preferred shareholders at the time of the merger. They were not. Because the conversion validly converted the Series C–1 preferred into common shares *before* the Liquidation Event (the merger), the Series C–1 shareholders were no longer entitled to any liquidation preference at the time the merger took place.

**40.** Even before the merger agreement and voting "lockups" were entered into, the Series C–1 shareholders held their preferred shares subject to, at any time, an "automatic" conversion by vote of a simple majority of the preferred shareholders.

### CONCLUSION

For the reasons stated above, the judgment of the Superior Court is affirmed.

**41.** Article 4(B)(2)(a) of the Certificate of Incorporation of Omneon, Inc., State of Delaware, Division of Corporations (as restated Dec. 5, 2007) (italics added).