**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

NATHAN A. COOK
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

April 17, 2024

Ronald N. Brown, III
Aaron S. Applebaum
DLA Piper LLP
1201 North Market Street, Suite 2100
Wilmington, DE 19801

Rudolf Koch
Robert L. Burns
Susan Hannigan Cohen
Nichole M. Henry
Edmond S. Kim
Richards, Layton & Finger, P.A.
920 North King Street, Suite 200
Wilmington, DE 19801

RE:   *Invictus Special Situations Master I, L.P. v. Invictus Global Mgmt., LLC*
       C.A. No. 2023-1099-NAC

Dear Counsel:

This letter addresses my findings of fact and conclusions of law from the March 28, 2024, trial on Counts I, IV, and VI of the plaintiff's complaint.[1]  For the reasons below, I enter judgment for the plaintiff on all three counts.

---

[1] *Invictus Special Situations Master I, L.P. v. Invictus Global Mgmt., LLC*, C.A. No. 2023-1099-NAC, Docket ("Dkt.") 1.  I have carefully considered all the evidence and cite to specific documents where appropriate.  Citations in the form of "JX __ ([Description])" refer to the trial exhibits.  Citations in the form of "PTO ¶ __" refer to the parties' pre-trial stipulations of fact.  *See* Dkt. 106. Citations in the form of "Tr. __ ([Witness])" refer to testimony from the trial transcript.  *See* Dkt. 125.  And citations in the form of "Post-Tr. __" refer to the post-trial hearing transcript.  *See* Dkt. 127.

## I. FACTUAL BACKGROUND

Plaintiff Invictus Special Situations Master I, L.P. ("Plaintiff" or the "Fund") is a privately held investment fund and Cayman Islands exempted limited partnership focused on litigation finance, distressed credit, and reorganization investment opportunities.[2] In early 2019, Defendants Cindy Chen Delano and Amit Patel founded Invictus Special Situations I GP, LLC ("Invictus GP") and Investment Global Management, LLC ("IGM," together with Delano, Patel, and Invictus GP, "Defendants").[3] In 2019 and 2020, IGM served as a subadvisor for Corbin Capital Partners, L.P.[4] Patel and Delano owned and controlled both Invictus GP and IGM at all relevant times.[5]

In 2020, the Fund was formed.[6] Invictus GP became the Fund's general partner on March 16, 2020.[7] On August 25, 2020, the Fund and Defendants Patel and Delano entered into the First Amended and Restated Limited Partnership Agreement (the "Partnership Agreement"); Delano did so in her individual

---

[2] PTO ¶ 8. The Fund has several feeder funds. Whether the Fund is acting on its own behalf or in connection with the feeder funds, however, does not impact this analysis. Thus, for simplicity, I will only refer to the Fund.

[3] JX 1 (IGM Slide Deck) at 4; JX 2 (Organization Chart).

[4] Tr. 233:9-18 (Delano).

[5] PTO ¶¶ 9-10.

[6] JX 2 (Organization Chart).

[7] JX 20 (Partnership Agreement); PTO ¶ 10.

capacity and Patel did so on behalf of various entities.[8] The Partnership Agreement is governed by Cayman law.[9] Also on August 25, 2020, the Fund entered into the Investment Management Agreement (the "Management Agreement"), whereby the Fund appointed IGM as the Fund's management company.[10] The Management Agreement is governed by Delaware law.[11]

Subject to limitations in the Partnership Agreement, Section 3.01 of the Partnership Agreement provided Invictus GP "with absolute, exclusive and complete right, power, and authority to operate, manage, and control the affairs of the [Fund] and carry out the business of the [Fund]."[12] The Management Agreement likewise gave IGM "full discretionary authority (until revoked in writing) to do all acts and things on behalf of the Funds which do or may constitute their respective business . . . ."[13]

---

[8] JX 20 (Partnership Agreement).

[9] *Id.* § 14.02.

[10] JX 21 (Management Agreement).

[11] *Id.* § 12.

[12] JX 20 (Partnership Agreement) § 3.01(a).

[13] JX 21 (Management Agreement) § 1.

Most relevant to this post-trial decision, Section 7 of the Management Agreement provides:

> The Funds shall have direct and unrestricted access to the books and records of [IGM] as such books and records relate to the Funds, and any and all other information pertaining to the business and affairs of the Funds and its Investments. [IGM] shall promptly provide the Funds with copies of any such information upon the Funds' request.[14]

IGM retained several law firms to advise it in its capacity as the Fund's management company.[15] On March 19, 2021, IGM engaged U.S. Bank Global Fund Services (Cayman) Limited ("U.S. Bank") to serve as the Fund's administrator.[16] U.S. Bank was responsible for the Fund's portfolio accounting, investor accounting, investor reporting, tax reporting, anti-money laundering services, and tax compliance.[17]

Under Section 3.08(b)(i) of the Partnership Agreement, Fund investors could remove Invictus GP "at any time, for any reason and without cause, by the

---

[14] *Id.* § 7.

[15] Tr. 240:21-241:3 (Delano).

[16] JX 27 (Fund Administration Agreement). Prior to U.S. Bank, NAV was the Fund's third-party administrator. PTO ¶ 85. The parties amended the administration agreement on February 23, 2022, adding U.S. Bancorp Fund Services, LLC (d/b/a U.S. Bank Global Fund Services) as a Fund administrator, in addition to the previously designated Cayman U.S. Bank entity. JX 34 (First Amended Fund Administration Agreement). The parties later amended the administration agreement on April 5, 2022. JX 39 (Second Amended Fund Administration Agreement).

[17] JX 27 (Fund Administration Agreement) Schedule A. As properly described by Mr. Woodmansee at trial, U.S. Bank's function is "more accounting and related in nature." Tr. 54:9 (Woodmansee).

affirmative vote of" at least two thirds of the Fund's investor interests.[18] Accordingly, on September 29, 2023, fund investors Corbin ERISA Opportunity Fund, Ltd., Corbin Opportunity Fund, L.P., Corbin Private Creditor Manager Fund, L.P., and New York State Nurses Association Pension Plan (collectively, the "Corbin Entities"), with Gatewood Capital Opportunity Fund, L.P. and Gatewood Opportunity Fund (Cayman), L.P. (collectively, the "Gatewood Entities"), removed Invictus GP as the Fund's general partner and IGM as the Fund's management company.[19] The investors replaced Invictus GP and IGM with TREO Vitus GP, LLC ("TREO GP") and TREO Asset Management, LLC ("TREO AM" and collectively with TREO GP, "TREO"), respectively.[20]

Upon appointment, TREO sent books and records requests to IGM.[21] U.S. Bank cooperated with TREO to produce the records it held as the Fund's administrator.[22] U.S. Bank, however, could only produce the items it created, monitored, or received from IGM.[23]

On October 18, 2023, several minority investors in the Fund, including

---

[18] JX 20 (Partnership Agreement).

[19] JX 69 (Resolution of the Fund Investors); *see also* JX 68 (Notice of Resolution).

[20] PTO ¶ 22.

[21] *Id.* ¶ 84.

[22] *Id.* ¶ 85.

[23] *Id.* ¶ 86.

Patel and Delano, requested that TREO provide information regarding its "background, capabilities, and strategy to successfully manage the Fund's assets."[24] On October 20, 2023, TREO responded that "such demands are nonsensical given that IGM has not turned over books and records with respect to these investments."[25] Many of these transactions involve investments related to The Tuesday Morning Corporation, DeCurtis Holdings LLC, and associated legal expenses.[26] TREO attached a books and records request to its response letter.[27]

Plaintiff's asserted books and records deficiencies fall into three general categories: (1) information related to the various investment positions and assets of the Fund, (2) information related to potential liabilities that may be asserted against the Fund, and (3) information related to potential causes of action and other assets the Fund may pursue.[28]

On October 30, 2023, Plaintiff filed its Verified Complaint.[29] The Verified

---

[24] JX 90 (October 18, 2023, Minority Investor Letter).

[25] JX 91 (October 20, 2023, TREO Response Letter).

[26] Many of the disputed information deficiencies relate to complex investment transactions that would require pages of details to give a cohesive background. In the interest of resolving Plaintiff's books and records claims expeditiously, I will therefore omit a detailed recitation of the underlying transactions.

[27] JX 91 (October 20, 2023, TREO Response Letter).

[28] *See* Tr. 24:15-25:11 (Woodmansee).

[29] Dkt. 1.

Complaint outlined eight causes of action against Defendants. Only three of Plaintiff's claims are relevant to this decision: Count I for breach of contract for failure to comply with the information rights provision provided under Section 7 of the Management Agreement; Count IV for declaratory judgment that IGM is breaching Section 7 of the Management Agreement; and Count VI for injunctive relief asking that all books and record related to the Fund be turned over to the Fund.[30] Plaintiff also filed a motion to expedite and for a temporary restraining order on the same day it filed its Verified Complaint.[31]

During a November 6, 2024, hearing on Plaintiff's motions to expedite and for a temporary restraining order, Defendants represented that they were "not disagreeing that [Plaintiff is] entitled to additional documents" and "that there may not even be a need for a trial" regarding the books and records disputes.[32] Indeed, Defendants asserted that they had given Plaintiff "access to what we believe is almost everything. The remaining items are subject, we believe, to confidentiality agreements that were executed in [Invictus GP's] own name."[33]

Two days later, on November 8, 2023, I held a follow-up hearing.[34] The next

---

[30] *Id.*

[31] *Id.*

[32] Dkt. 47. at 14:20-23.

[33] *Id.* at 8:1-4.

[34] Dkt. 41.

day, on November 9, 2023, I entered a status quo order relating to the disputed funds, resolving the temporary restraining order motion.[35] On November 14, 2023, I granted the parties stipulated schedule for an expedited trial on Counts I, IV, and VI.[36]

Plaintiff filed a motion to compel on December 19, 2023, asserting that Defendants were failing to comply with their discovery obligations.[37] On January 4, 2024, I heard argument on the motion to compel before granting Plaintiff's motion.[38] On January 6, 2024, Defendants filed a notice of removal in the United States District Court for the District of Delaware.[39] On January 8, 2024, I held a teleconference, and confirmed that the trial, scheduled for January 11, 2024, was cancelled, given Defendants' notice of removal.[40] Less than a week later, on January 12, 2024, the federal court remanded the case back to this Court.[41] Trial was rescheduled for February 6, 2024.

On February 5, 2024, the day before the trial, Defendants filed a letter on

---

[35] Dkt. 32.

[36] Dkt. 39. The original schedule also contemplated Count V, but the parties amended the schedule to limit the trial to only Counts I, IV, and VI. Dkt. 88.

[37] Dkt. 64.

[38] Dkt. 111.

[39] Dkt. 82.

[40] Dkt. 113.

[41] Dkt. 86.

the docket (the "February Letter").[42] In the February Letter, Defendants agreed to produce documents to Plaintiff, with two exceptions. First, Defendants carved out eight specific categories of documents and records they believed fell outside of Plaintiff's information rights, including documents unrelated to the Fund or its investments.[43] And second, Defendants asserted that they would have "no objection to producing privileged communications with counsel," subject to a condition precedent that Plaintiff pay the legal fees associated with the requested documents.[44] Defendants closed their letter by noting that their "decision to produce the documents outlined above significantly narrows the disputes concerning the remaining categories of documents. Accordingly, Defendants believe that the trial should focus on any categories of documents in the eight categories above."[45]

The Court held trial with three live witnesses and over 800 joint trial exhibits on February 6, 2024, to address Counts I, IV, and VI of Plaintiff's Verified Complaint.[46] The parties completed post-trial briefing on March 25, 2024, and the Court heard post-trial oral argument on March 28, 2024.[47] In the post-trial

---

[42] JX 230 (February Letter).

[43] *Id.* at 3.

[44] *Id.* at 2.

[45] *Id.* at 4.

[46] Dkt. 114.

[47] Dkt. 127.

briefing and post-trial argument, Defendants largely did not contest the facts of the case and instead asserted legal arguments for dismissal, arguments Defendants waived with the February Letter.

## II. LEGAL ANALYSIS

Plaintiff's claims before me concern the books and records related to the Fund. Plaintiff seeks specific performance of Section 7 of the Management Agreement, in addition to both declaratory and injunctive relief arising from its right to the books and records related to the Fund.

### A. Scope of the Fund's Information Rights

"When interpreting a contract, the role of a court is to effectuate the parties' intent."[48] "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[49] "Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning."[50] "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining

---

[48] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[49] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[50] *Id.* (footnote omitted).

an understanding of intent."[51]

Plaintiff points to its information rights under Section 7 of the Management Agreement.[52] Section 7 of the Management Agreement gives the Fund "direct and unrestricted access to the books and records of the Management Company as such books and records relate to the Funds, and any and all other information pertaining to the business and affairs of the Funds and its Investments."[53] This information rights provision is broad—*all* books, records, and information that relate to the Fund. Indeed, at trial, Mr. Woodmansee understandably described it as "probably the broadest information, books and records provision I've seen."[54]

But Section 7 only gives the Fund access to IGM's books and records that relate to the Fund. In light of IGM having operated almost exclusively as the Fund's management company, however, that information right gives the Fund

---

[51] *City Inv. Co. Liquid. Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[52] Plaintiff also briefly asserts that under Cayman law the Fund's books and records are owned by the general partner of the Fund. *See* JX 97 (Mourant Letter). In other words, once the Corbin Entities and the Gatewood Entities removed Invictus GP as the Fund's general partner the rights to the documents and records automatically passed to the replacement general partner—TREO GP. But rather than engage on the Cayman entity arguments, the parties instead focused their briefing and arguments on Section 7 of the Management Agreement. I therefore do the same.

[53] JX 21 (Management Agreement) § 7.

[54] Tr. 23:12-13 (Woodmansee).

access to almost everything in IGM's custody.[55]

Although Defendants have suggested that U.S. Bank has everything Plaintiff needs, U.S. Bank is not the custodian of all the Fund's books and records, despite acting as the Fund's administrator. During post-trial argument, Plaintiff, further demonstrating its point, listed several examples of key documents not maintained at U.S. Bank.[56]

Rather than dispute the definition of "related" and its application to IGM's books and records, Defendants articulated the following eight categories of documents they perceive to be outside of the scope of Section 7 in the February

---

[55] As mentioned, Plaintiff often categorized the information it seeks in this action into three categories: (1) information related to the Fund's investments, (2) information related to the Fund's potential liabilities, and (3) information related to causes of action that the Fund may pursue. In addition to general information deficiencies related to the first category, Plaintiff has identified several Fund liabilities and potential claims where the Fund has little to no visibility due to IGM's failure to produce the relevant books and records. Post-Tr. 14:22-17:6.

[56] Post-Tr. 12:21-13:17 ("All of the email correspondence related to the Fund; copies of underlying invoices that were purportedly paid by IGM for which IGM sought reimbursement from the Fund; IGM's receipts or other proof of payment with respect to reimbursed expenses, documentation of the $6.9 million that IGM received on account of Fund investments from Tuesday Morning; documentation regarding the allocation of the $25 million administrative expense claim in Tuesday Morning and how that claim was to be addressed among the three loan positions and between the Fund and Mr. Redleaf; agreements between IGM and the Groombridge law firm regarding IGM's agreement to convey a share of UnumX from the Fund to Groombridge; the post-foreclosure direction and contribution agreement to which the Fund is a party; the post-foreclosure expense reimbursement agreement to which the Fund is a party; documents related to the Fund's claims against the Polsinelli firm; and documents relating to the claims against Corbin that Ms. Chen Delano says the Fund has.").

Letter:

1. All personal documents and communications involving Ms. Delano and Mr. Patel.
2. All non-Fund related documents and/communications involving either Ms. Chen Delano and Mr. Patel, such as documents related to investments outside of the Fund.
3. All financial documents and communications of IGM and not the Fund (financial statements, tax returns, business and marketing plans, bank statements, etc.).
4. All administrative documents and communications concerning IGM, and not the Fund (*e.g.*, employment matters, leases, software licenses, etc.).
5. All privileged documents and communications with IGM's counsel that provided legal advice to IGM about its duties and responsibilities as a fund manager that were not involved in or related to the business and affairs of the Fund or its Investments (*i.e.*, Kirkland and Orrick).
6. All documents and communications (including, but not limited to privileged communications) concerning any IGM dispute or litigation not related to the Fund or its Investments.
7. All documents and communications concerning separately managed accounts ('SMAs') and sub-advisory relationships, which are separate arrangements from the Fund and its Investments.
8. All documents and communications that were created or occurred after IGM was removed as manager of the Fund, which, for the avoidance of doubt, includes any privileged communications about any litigation between the Fund and Defendant.[57]

At post-trial argument, Plaintiff walked through each of the eight categories and articulated what I find to be the proper application of Section 7 to Defendants' eight asserted exceptions.

The first exception excludes "[a]ll personal documents and communications" related to Delano and Patel's personal lives outside of IGM. These emails are properly excluded, as they do not relate to the Fund.

---

[57] JX 230 (February Letter) at 3.

The second exemption excludes "non-Fund related documents and/communications," including "documents relating to investments outside the Fund." Such exclusion is appropriate to the extent that the documents and communications are truly unrelated to the Fund. For the avoidance of doubt, this exception does not include any research, communications, or any other documents created on behalf of the Fund; those documents fall within the Fund's information rights under Section 7.

The third and fourth exemptions relate to financial and administrative documents and communications. To the extent that these do not pertain in any way to the Fund, Defendants do not need to produce these documents.[58] Yet Defendants' purported exemptions in the February Letter include items that are almost certainly related to the Fund, such as IGM's bank statements. Despite Defendants' attempt to portray IGM as a stand-alone company with little overlap with the Fund, trial has shown that to be far from the truth. The vast majority of IGM's actions are related to the Fund, including IGM routinely receiving payments on behalf of the Fund.[59]

The fifth exemption relates to any legal advice IGM received while acting as the Fund's management company, including but not limited to advice received

---

[58] For the avoidance of doubt, documents and communications that concern actual or potential charges to the Fund must be produced.

[59] *See, e.g.*, Tr. 64:23-65:3 (Woodmansee).

from Kirkland & Ellis and Orrick, Herrington & Sutcliffe. Section 14.10 of the Partnership Agreement provides that Invictus GP, "acting on behalf of the [Fund], has initially selected Orrick, Herrington & Sutcliffe LLC ('Partnership Counsel') as legal counsel to [Invictus GP] when acting on behalf of the [Fund]."[60] Additionally, "Counsel to the Partnership may also be counsel to the General Partner and its Affiliates."[61]

At trial, Delano asserted that under Section 14.10, the firms Kirkland & Ellis and Orrick, Herrington & Sutcliffe were providing services to Invictus GP, not the Fund. Even if I were to adopt Delano's interpretation of the Partnership Agreement, to the extent that IGM has the documents, such legal services are still entirely within the scope of Section 7 of the Management Agreement since they are all in the context of Invictus GP and IGM's services to the Fund.

Defendants contend that Plaintiff must pay Defendants' legal fees as a condition precedent to receiving the documents related to the legal advice and disputes. Defendants assert that, under the Partnership Agreement, the Fund is responsible for paying "all Operational Expenses," which include "all legal, accounting, tax, consulting and professional services fees and expenses (including tax preparation) relating to the Partnership and its activities . . . ."[62] Yet

---

[60] JX 20 (Partnership Agreement) § 14.10.

[61] *Id.*

[62] *Id.* § 2.05 and Appendix A.

Defendants do not identify any legal or contractual basis for their assertion that Plaintiff's broad information right is conditioned on the prior payment of such expenses. "[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."[63] When pressed at post-trial, Defendants could not point to anything in the Management Agreement that conditioned Plaintiff's Section 7 information rights on the payment of legal fees.[64] If anything, Defendants may have an independent claim under Section 2.05 of the Partnership Agreement or Section 5 of the Management Agreement for reimbursement. But in no way does that allow Defendants to shirk their obligations under Section 7 of the Management Agreement.[65]

The sixth exception relates to IGM's disputes "not related to the Fund or its Investments." Again, so long as the dispute is unrelated to the Fund or IGM's services to the Fund, IGM does not need to produce the documents related those disputes. During post-trial argument, Plaintiff highlighted that it has no interest in receiving, for example, documents relating to the litigation with the Corbin

---

[63] *Union Fire Ins. Co. of Pittsburgh, P.A. v. Pan Am. Energy, LLC*, 2003 WL 1432419 at *4 (Del. Ch. Mar. 19, 2003).

[64] Post-Tr. 37:1-3 ("Well, Your Honor, we concede that there is no express condition in Section 7 of the management agreement.").

[65] To the extent that Invictus GP or IGM believes it has a right to reimbursement under the Partnership Agreement or the Management Agreement, it may assert its claim in a separate action.

Entities and the Gatewood Entities.

The seventh and eighth exceptions concern documents and communications related to IGM's advisement roles outside of the Fund and after IGM was removed as the Fund's management company. But IGM's advisement roles outside of the Fund are limited. In fact, outside of the limited sub-advisory services it offered to Corbin Entities, such sub-advisement roles are essentially nonexistent.[66] But to the extent IGM provided services to identifiable clients outside of the Fund, IGM may exclude such documents. And finally, Plaintiff does not contest IGM's position that it does not need to produce documents and communications that IGM created after its removal.

This is not rocket science. If the information relates to the Fund, and almost everything IGM did during its time as the Fund's management company related to the Fund, then IGM is obligated under Section 7 of the Management Agreement to produce the records to the Fund. Defendants have taken aggressive stances in this litigation as to what "relates" to the Fund. If it is not already clear, I find Section 7 to be extremely broad, and I order production accordingly.

## B. Late Arguments

Rather than engage with the scope of Plaintiff's information right or raise arguments as to the eight categories that Defendants identified in the February

---

[66] Tr. 216:14-21 (Patel).

Letter, Defendants used their post-trial brief to assert that Counts I, IV, and VI fail.  But Defendants cannot now assert arguments they waived with the February Letter.

In the February Letter, filed the day before trial, Defendants represented that they "believe that the trial should focus on any categories of documents in the eight categories above."[67]  Then, in a complete reversal of position, Defendants assert after trial that specific performance, declaratory judgment, and injunctive relief in general are not warranted and that this Court must dismiss all three of Plaintiff's claims in their entirety.[68]  This is in stark contrast to Defendants' representation that "Defendants' decision to produce the documents outlined [in the February Letter] significantly narrows the disputes concerning the remaining categories of documents."[69]

Parties are encouraged to work together to narrow issues and allow for courts to efficiently adjudicate only the matters that remain in dispute.  But a party may not narrow issues for trial, participate in a trial tailored to those

---

[67] JX 230 (February Letter) at 4.

[68] In addition to their *volte-face*, Defendants confusingly argue for dismissal of Plaintiff's declaratory judgment claim in their post-trial briefing, but propose that I grant judgment in Plaintiff's favor on the claim in their proposed order. *Compare* Dkt. 119 at 32, 34, *with* Dkt. 119 at Exhibit A [hereinafter "Defendants' Proposed Order"] ¶ 2 ("Judgment is entered in favor of the Fund only with respect to Count IV (declaratory judgment) of the Complaint.").

[69] JX 230 (February Letter) at 4.

narrowed issues, and then, in its post-trial brief, revert back to arguments that it waived in its pre-trial concession.

Under Section 7, Defendants agreed to "promptly provide" information to Plaintiff. Defendants' attempt to assert their previously waived defenses reinforces my concern that Defendants are taking positions to delay compliance with their bargained-for contractual obligations.

In the early stages of litigation, Defendants represented to me that they would promptly produce the bulk of the disputed documents.[70] But Defendants failed to follow through. Then, just days before the originally scheduled trial, Defendants removed this action to federal court, which the federal court in turn quickly sent back. And then, on the eve of the rescheduled trial, Defendants filed the February Letter, asserting that it "significantly narrows the disputes concerning the remaining categories of documents." Yet, following the February Letter, Defendants have basically done nothing to prepare the uncontested documents for production.[71] And now, in post-trial briefing and argument, Defendants attempt to assert dismissal arguments they had already waived.

---

[70] Dkt. 41 at 31:1-7 ("But I think it's also important to consider that defendants have represented to me on multiple occasions, both during this hearing and during our prior hearing, that defendants are taking very active steps and will take very active steps to provide and facilitate access to nearly all of the information that the plaintiffs are requesting.").

[71] *Id.* at 41:12-43:21.

Defendants' post-trial arguments are improper and consequently are waived.

## C. Production Procedure

In its proposed order, Plaintiff requests that Defendants turn over all books and records within five business days.[72]  Defendants, on the other hand, request twenty-one business days to produce electronic documents and non-electronic records and ninety days to produce emails.[73]  I agree with Plaintiff—five business days is an appropriate window for IGM to produce all books, records, and information related to the Fund.

Defendants' continued delay in producing the books and records is concerning.  Despite Defendants conceding Plaintiff's right to additional books and records in the February Letter, Defendants had not, as of post-trial argument, produced a single document to Plaintiff since the February Letter.[74]  And at post-trial argument it became apparent that Defendants had done exceedingly little in the over seven weeks since Defendants filed the February Letter to prepare to

---

[72] *See* Dkt. 118 Exhibit A ¶ 2.

[73] Defendants' Proposed Order ¶ 3.  I also note that Defendants' proposed order uses "emails" instead of the term "communications" used in the February Letter.  To the extent Defendants were attempting to avoid producing other electronic communications related to the Fund, such as Microsoft Teams chats and Bloomberg messages used at IGM to communicate information related to the Fund, I expressly order production of these communications.

[74] Post-Tr. 8:1-5.

produce even the multitude of documents to which Defendants agreed Plaintiff was entitled.[75] Consistent with my guidance at the conclusion of post-trial argument,[76] I trust that Defendants have already done most of the heavy lifting and indeed produced many of the subject books and records. But if Defendants have instead continued to deny Plaintiff its information rights, much of the burden is self-inflicted.[77]

Moreover, the broad nature of Section 7 of the Management Agreement alleviates much of the perceived burden Defendants assert they will incur if expected to comply with their contractual obligation, an obligation they have neglected for about six months.

Defendants argued they will need time to undertake a time-intensive document-by-document review process, similar to what occurs in document production in complex litigation. But the trial record demonstrates that nearly all of IGM's work was for the Fund and almost all of its documents are covered by the Section 7 information access right. Rather than sifting through each of IGM's records one by one to decide what information Defendants should turn over to Plaintiff, Defendants should start with the assumption that all of IGM's records

---

[75] *Id.* at 41:12-43:21.

[76] *Id.* at 55:13-19.

[77] *Id.* at 55:6-9 ("[D]efendants should not be surprised if my ruling sets a very short window along the lines of what plaintiffs have asked for in terms of production . . . .").

created or maintained from its appointment as the Fund's management company on August 25, 2020, until its removal on September 29, 2023, relate to the Fund. Defendants should then target documents that fall into one of the permitted exceptions. This process is especially appropriate, given that the parties expressly bargained for Defendants to "promptly provide" the information to Plaintiff.

Plaintiff has requested that Defendants provide a log for withheld or redacted documents. The parties bargained for a very broad contractual information right. And Defendants have not argued why Plaintiff's log request would be inappropriate given the circumstances of this case, where Defendants have repeatedly interfered with the bargained-for information right. Plaintiff's logging request in this instance is therefore appropriate and will be granted.

## III.   CONCLUSION

Having carefully considered all the evidence presented at trial, and for the reasons set forth above, I am entering judgment for the Fund on Counts I, IV, and VI by granting Plaintiff's proposed form of order with modifications.

*/s/ Nathan A. Cook*
Vice Chancellor Nathan A. Cook