## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| REYBOLD CONSTRUCTION COMPANY, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. N22C-06-206 PRW |
| LENNAR CORPORATION, et al., | ) ) | |
| Defendants. | ) ) | |

Submitted: July 11, 2025
Decided: August 13, 2025

## <u>DECISION AFTER TRIAL</u>

Jeffrey M. Weiner, Esquire, LAW OFFICES OF JEFFREY M. WEINER, Wilmington, Delaware, *Attorney for Plaintiffs.*

Anthony M. Saccullo, Esquire, and Thomas H. Kovach, Esquire, A.M. SACCULLO LEGAL, L.L.C., Bear, Delaware; Benjamin A. Garber, Esquire, KLEINBARD L.L.C., Philadelphia, Pennsylvania, *Attorneys for Defendant/Counterclaim Plaintiff CalAtlantic Group, LLC.*

**WALLACE, J.**

In February 2015, Plaintiff Reybold Construction Company entered into a Settlement Agreement with Ryland, who is now Defendant CalAtlantic,[1] to settle disagreements over the development and maintenance of two residential communities:  Meridian Crossing and Meridian Crossing II.

But their discord continued.  Both parties now claim that the other breached the Settlement Agreement.  Reybold claims breach because CalAtlantic ceased payments.  In response, CalAtlantic has raised issue with Reybold's inconsistent and delayed billing practices.  The parties also disagree about cost obligations and propose different interpretations of the Settlement Agreement.

## I. THE TRIAL

During the three-day bench trial, the Court heard the in-person testimony of:

| | |
|---|---|
| Kristen DuHadaway | Greg Lingo |
| Angela Jo Nagle | Patrick McNelis |
| Jerome S. Heisler, Jr. | Daniel Stewart |
| John Poole, P.E. | |

The parties also submitted over 150 exhibits.[2]  During trial, CalAtlantic moved for judgment as a matter of law, and was denied.[3]  Now, the Court determines the liability of both parties under their respective claims and counterclaims and the

---

[1]    For convenience, the Court will use "CalAtlantic" for any actions taken by CalAtlantic or any of its predecessors.

[2]    D.I. 114 (Trial Worksheet).

[3]    *Id.*

- 1 -

appropriate damages, if any.[4]

## II. APPLICABLE LEGAL PRINCIPLES AND STANDARDS

Though the Court sits as the sole factfinder, it has applied the same principles of law in its deliberations and consideration of these claims that a jury would have been instructed to follow. The Court may highlight some of those most applicable to this case. But the fact that some particular point or concept may not be mentioned here shouldn't be read as any indication that the Court did not—during its deliberations—consider all legal principles applicable to this case and to the parties' claims and defenses.

In reaching its verdict, the Court has examined all exhibits submitted and considered the testimony of all witnesses on both direct and cross. And the Court has made its own assessment of each witness's credibility and reconciled, as best it could, any inconsistencies in the testimony and documentary evidence.[5]

The Court has also considered the applicable Delaware law that defines the legal precepts applicable to the claims and defenses the parties have forwarded. The Court has applied the Delaware Rules of Evidence to the testimony and exhibits

---

[4]    In addition to the trial evidence and arguments made by counsel, the Court also now has the benefit of the parties' post–trial briefing. D.I. 127, 130, 132, 136.

[5]    *Pencader Assoc., LLC v. Synergy Direct Mortg. Inc.*, 2010 WL 2681862, at *3 (Del. Super. Ct. June 30, 2010) ("[I]n a bench trial, it is the Court's role to resolve the conflicts in witnesses' testimony and weigh their credibility."); *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 545-46 (Del. Super. Ct. 2005) (setting forth "the customary Delaware standard" a trial judge applies when assessing trial testimony and evidence in a bench trial).

presented at trial. Consistent with the Court's knowledge of those rules and the specific rulings that were articulated both pre-trial and during the trial proceedings, it only used evidence allowed under those rules and rulings for its deliberation. And, of course, the Court has considered each party's respective arguments, both oral and written, on the weight to be accorded to the testimony and evidence.

### III. FACTUAL FINDINGS

For certain actions at trial, it is difficult at times to completely segregate findings of fact from conclusions of law.[6] So, to the extent any one of the Court's findings of fact here might be more appropriately viewed as a conclusion of law, that finding of fact may be considered the Court's conclusion of law on that point.[7]

### A. THE UNDERLYING SETTLEMENT AGREEMENT AND ITS RELATED LITIGATION

When issues arose over the development of the Meridian Crossing residential community, the parties—Reybold, The Ryland Group, Inc. (which later became CalAtlantic) and other entities—entered into a Release and Settlement Agreement ("Settlement Agreement").[8] The Settlement Agreement provided a clean slate to permit the parties to continue their relationship. It released all claims arising before

---

[6] *Intermec IP Corp. v. TransCore, LP*, 2023 WL 5661585, at *2 (Del. Super. Ct. Aug. 23, 2023).

[7] *Id.* (citing *Facchina Constr. Litigations*, 2020 WL 6363678, at *2 n.12 (Del. Super. Ct. Oct. 29, 2020) (collecting authority)).

[8] Def.'s Ex. 1 (Settlement Agreement).

February 25, 2015, and aimed to more clearly outline the parties' respective obligations.[9] Its provisions govern the parties' responsibilities for the construction of common facilities and future improvements.[10] But, once again, disputes arose regarding the responsibilities of the parties under the Settlement Agreement.

Reybold, in its breach-of-contract claim, alleges that CalAtlantic violated the Settlement Agreement by failing to pay its proportion of the costs for various projects, including open space maintenance, common facility work, future Reybold improvement costs, and the paving of private alleyways.[11]

In response, CalAtlantic brought counterclaims alleging breach of contract and seeking declaratory relief.[12] It says that its obligation to pay Reybold wasn't triggered because Reybold didn't follow the Settlement Agreement's billing procedures and it delayed sending invoices in favor of sending mass submissions.[13] And CalAtlantic argues that if its obligation to pay was indeed triggered, then it still isn't obligated to pay management fees, for the paving of the private alleyways, or for the construction of stormwater ponds.[14] CalAtlantic also asserts that Reybold

---

[9]  Settlement Agreement at L.

[10]  *See generally* Settlement Agreement.

[11]  Reybold Post-Trial Opening Br. at 36-42 (D.I. 127).

[12]  CalAtlantic Post-Trial Opening Br. at 43-44 (D.I. 130) (discussing only its counterclaims of breach of contract and declaratory judgment); D.I. 29 (Def.'s Answer & Countercls.).

[13]  CalAtlantic Post-Trial Opening Br. at 19-30.

[14]  *Id.* at 19-36.

has incorrectly calculated its proportionate share percentage for work completed under the Settlement Agreement.[15]

## B. TERMS OF THE SETTLEMENT AGREEMENT

### 1. Future Reybold Improvements

The Settlement Agreement governed the division of costs between Reybold and CalAtlantic for "Future Reybold Improvements."  It defines "Future Reybold Improvements" as "open space improvements for the Community which are not yet started or complete as set forth in Exhibit F attached hereto and incorporated herein."[16]  This included work on improvement projects like landscaping, roads, community amenities, and stormwater management systems.[17]

Per the Settlement Agreement, CalAtlantic is responsible for "23.94% or 203/848ths of the cost of the Future Reybold Improvements."[18]  But the parties now disagree about whether this percentage was supposed to change as the ownership proportion of lots changed.[19]

The Settlement Agreement gives further requirements for the construction of

---

[15]   *Id.* at 32-33.

[16]   Settlement Agreement § 8.

[17]   *See* Pl.'s Ex. 32(a).

[18]   Settlement Agreement § 9.

[19]   Reybold Post-Trial Answering Br. at 24-26 (D.I. 132); CalAtlantic Post-Trial Opening Br. at 32-33.

any Future Reybold Improvements and the allocation of costs.[20]  Section 9 states:

> Reybold agrees that Ryland's Proportionate Share [now CalAtlantic's Proportionate Share] for the Future Reybold Improvements shall be based on actual costs. The actual cost of the Future Reybold Improvements will be determined by the lowest reasonable bid from competent contractors selected by Reybold, or if Reybold elects to perform such work itself or by contractors selected without the use of competitive bidding, the actual costs shall be based on reasonable and competitive rates. Ryland shall pay Ryland's Proportional Share obligation for each Future Reybold Improvement within thirty (30) days after receipt of: (i) a certification from Reybold that such Future Reybold improvement has been completed in full and in accordance with the requirements of authorities having jurisdiction over the Community under Applicable Laws; and (ii) full and complete copies of invoices, receipts and other documentation reasonably requested by Ryland to evidence the actual cost for completion of such Future Reybold Improvement.[21]

The parties also disagree on whether the costs associated with the stormwater ponds are covered under this provision.[22]

## 2.  Common Facility Fees

The Settlement Agreement also governs work completed on the common facilities. CalAtlantic is responsible for a portion of the common facilities fees.  The Settlement Agreement defines "Common Facility Fees" as "expenses incurred by Reybold for the operation and maintenance of the open space and common facilities

---

[20]  Settlement Agreement § 9.

[21]  *Id.*  Recall, at this point, CalAtlantic is responsible for any of Ryland's obligations under the Settlement Agreement.

[22]  Reybold Post-Trial Answering Br. at 30-32; CalAtlantic Post-Trial Opening Br. at 34-36.

(including, without limitation, the pool and the clubhouse) . . . ."[23]

Specifically, the Settlement Agreement states:

> The Common Facility Fees shall be based on actual costs. The actual cost of the Common Facility Fees will be determined by the lowest reasonable bid from competent contractors selected by Reybold, or if Reybold elects to perform such work itself or by contractors selected without the use of competitive bidding, the actual costs shall be based on reasonable and competitive rates. Ryland shall pay Ryland's Proportionate Share obligation for each Common Facility Fee within thirty (30) days after receipt of: (i) a certification from Reybold that all work in connection with such Common Facility Fee has been completed in full in accordance with the requirements of authorities having jurisdiction over the Community under Applicable Laws; and (ii) full and complete copies of invoices, receipts and other documentation reasonably requested by Ryland to evidence the actual cost for the work serving as the basis for the Common Facility Fee in question.[24]

Reybold is responsible for its proportionate share for the "Common Facility Fees" only from the period "between the Effective Date of [the Settlement] Agreement and the date of Turnover."[25]

### 3. Paving Reimbursements

The parties also disagree about whether the cost for paving the alleyways is covered under the Settlement Agreement.[26] They reference Section 17, which states:

> Ryland agrees to assume responsibility for both the topcoating of the roadways and the turnover to New Castle County of the sewer

---

[23] Settlement Agreement § 14(p).

[24] *Id.*

[25] *Id.*

[26] Reybold Post-Trial Answering Br. at 26-30; CalAtlantic Post-Trial Opening Br. at 33-34.

- 7 -

facilities that are associated with the Third party Lots.[27]

Additionally, Section 18 provides:

> Reybold and Ryland acknowledge and agree that, as evidenced on Exhibit H-6 attached hereto, . . . Reybold will be required to apply topcoat and perform other maintenance requirements. . . and shall be reimbursed by Ryland based on Reybold's actual costs for the work. . . .[28]

Exhibit H-6 lists specific streets that are covered by Section 18.[29]

## C. DISPUTED MODIFICATIONS TO THE SETTLEMENT AGREEMENT

The parties also disagree about Reybold's belief that it is entitled to a management fee.[30] There is no specific term in the Settlement Agreement granting Reybold the right to a 15% management fee, but Reybold believes that the fee was incorporated into the Settlement Agreement via the exhibits and because CalAtlantic didn't object to the practice.[31]

Or, in the alternative, Reybold argues that the Settlement Agreement was modified because CalAtlantic didn't object to its inclusion in the invoices that it paid.[32] But any modification to the Settlement Agreement must comply with Section

---

[27] Settlement Agreement § 17.

[28] *Id.* § 18.

[29] Settlement Agreement Ex. H-6.

[30] Reybold Post-Trial Answering Br. at 23-24; CalAtlantic Post-Trial Opening Br. at 32-33.

[31] Reybold Post-Trial Answering Br. at 23.

[32] *Id.* at 24.

19(b), which states:

> This Agreement and the Exhibits hereto set forth all of the promises, covenants, agreements, conditions, and undertakings between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written. There are no material promises, covenants, agreements, conditions, undertakings or understandings between the parties hereto which have not been incorporated and integrated herein to the satisfaction of the parties and their respective legal counsel. This Agreement may not be changed orally, but only by an agreement in writing, duly executed by or on behalf of the Party against whom enforcement of any waiver, change, modification, assignment, consent or discharge is sought.[33]

## D. REYBOLD'S BILLING PRACTICES AND CALATLANTIC'S RESPONSE

Throughout their relationship, Reybold's method of providing invoices to CalAtlantic could be described as: uncoordinated, at best. The evidence at trial demonstrated that Reybold had no systematic method for processing and providing invoices. Reybold didn't send bills on any regular, monthly basis; instead, it billed for work in large batches and included invoices for work that had been completed more than a year prior.[34] Some invoices were even spontaneously hand-delivered in large amounts at meetings regarding unrelated issues.[35] Also, none of the invoices

---

[33] Settlement Agreement § 19(b).

[34] *See, e.g.*, 3/12/25 AM Trial Tr. at 145-46 (D.I. 125).

[35] 3/12/25 AM Trial Tr. at 157; 3/13/25 Trial Tr. at 16-17 (D.I. 124); *see* 3/11/25 Trial Tr. at 31, 135-36 ("I paged through them while standing there and had some dates that go back multiple months and over the course of a year at least. It's not customary to receive information in that fashion, so I was a little put off.") (D.I. 122).

were accompanied by a certificate of completion, as required by the Settlement Agreement.[36]

CalAtlantic paid most invoices until May 2019.[37] After that, it ceased all payments without warning or reason.[38] Prior to ceasing payment, CalAtlantic never raised any concerns about the lack of procedure or untimeliness of presenting invoices.[39] Nor did CalAtlantic have a past practice of requesting additional supporting documentation prior to paying an invoice.[40] There was also no evidence presented to indicate that CalAtlantic raised any particular issues regarding any invoices.[41]

## IV. LEGAL FINDINGS AND VERDICT

As this was a civil trial, both parties had the burden of proving their respective

---

[36] 3/12/25 AM Trial Tr. at 148; 3/13/25 Trial Tr. at 11-12.

[37] *See* Pl.'s Ex. 33.

[38] *See id.*

[39] *See, e.g.*, 3/12/25 PM Trial Tr. at 24 (D.I. 123); 3/12/25 AM Trial Tr. at 89-90 ("I never was aware of anything until litigation really began or the proposed litigation. And then we all of a sudden heard alleyways, and then later we heard about a certification.").

[40] 3/13/25 Trial Tr. at 64-65:

> Q. Now, where at this point looking at invoices from April, May, and June of 2017, which are two years after the February 15, 2017, Settlement Agreement and we're seeing 20 or 30 invoices that have been paid, where is there any request from CalAtlantic once you joined in August of 2016 for any clarification as to the certification, work performed, actual cost? Where is any documentation from CalAtlantic to Reybold?
>
> A. There's no documentation of that.

[41] *See* Pl.'s Ex. 33 (specifically looking at invoices for common facility fees that were paid within a couple months of receipt).

- 10 -

claims by a preponderance of the evidence.[42]

The Court will address the alleged breaches of the Settlement Agreement, followed by the proper interpretation of the provisions at issue, then any damages, and finally, legal fees and prejudgment interest. Additional facts are included now where needed but the Court will, where possible, seek to avoid repetition.

## A. BOTH PARTIES BREACHED THE SETTLEMENT AGREEMENT

At the heart of this dispute are sparring breach-of-contract claims. Reybold claims that CalAtlantic has breached the Settlement Agreement by failing to pay the majority of the invoices since May 2019.[43] CalAtlantic counters that it wasn't required to pay because Reybold didn't comply with the procedure for submitting invoices.[44]

"Breach of contract is a claim with three elements: '1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff.'"[45]

But "[a] party may be excused from performing if the other party is in material

---

[42] *See, e.g.*, *Navient Sols., LLC v. BPG Off. P'rs XIII Iron Hill LLC*, 2023 WL 3120644, at *10 (Del. Super. Ct. Apr. 27, 2023).

[43] Reybold Post-Trial Opening Br. at 11; *see* Pl.'s Ex. 33.

[44] CalAtlantic Post-Trial Opening Br. at 19-30.

[45] *Humanigen, Inc. v. Savant Neglected Diseases, LLC*, 238 A.3d 194, 202 (Del. Super. Ct. 2020) (quoting *Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1279 n.28 (Del. 2016)).

breach."[46] Materiality of a breach is "determined by 'weighing the consequences in light of the actual custom of men in the performance of contracts similar to the one that is involved in the specific case.'"[47] This occurs when the party's failure is "so fundamental to a contract that the failure . . . defeats the essential purpose of the contract or makes it impossible for the other party to perform the contract."[48]

"Conversely, a slight breach by one party, while giving rise to an action for damages, does not terminate the obligations of the injured party under the contract."[49]

### 1. Reybold did not commit a material breach.

The Court finds that Reybold didn't breach the "actual cost" provision. But

---

[46] *Est. of Buller v. Montague*, 2020 WL 996883, at *3 (Del. Super. Ct. Mar. 2, 2020).

[47] *Carey v. Est. of Myers*, 2015 WL 4087056, at *20 (Del. Super. Ct. July 1, 2015), *aff'd*, 132 A.3d 749 (Del. 2016) (citing *Preferred Inv. Services v. T & H Bail Bonds*, 2013 WL 3934992, at *21 (Del. Ch. July 24, 2013)).

[48] *Shore Invs., Inc. v. Bhole, Inc.*, 2011 WL 5967253, at *5 (Del. Super. Ct. Nov. 28, 2011), *amended by* 2012 WL 2337793 (Del. Super. Ct. Apr. 9, 2012), and *judgment entered*, (Del. Super. Ct. 2012), *aff'd in part, rev'd in part*, 67 A.3d 444 (Del. 2013), and *judgment entered*, (Del. Super. Ct. 2012), and *aff'd in part, rev'd in part*, 67 A.3d 444 (Del. 2013) (quoting 23 Williston on Contracts § 63:3 (4th ed. 2021)). "Delaware courts have adopted the factors set forth in the Restatement of Contracts to consider the materiality of a breach, including: '(a) the extent to which the injured party will be deprived of the benefit of which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all of the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.'" *Roberts v. Moffa Constr. Co. LLC*, 2024 WL 5184100, at *3 (Del. Super. Ct. Dec. 20, 2024) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 241 (AM. LAW INST. 1981)).

[49] *Est. of Myers*, 2015 WL 4087056, at *20.

it did commit the first breach by not following the billing procedure set forth in the Settlement Agreement. That breach, though, was not material.

### a. Reybold used a competitive bidding process and reasonable competitive rates for work it completed itself.

CalAtlantic contends that Reybold breached the Settlement Agreement by not using a competitive bidding process, which breached the "actual cost" provisions.[50] Not so.

As defined by the Settlement Agreement, "actual cost" for Future Reybold Improvements is "determined by the lowest reasonable bid from competent contractors selected by Reybold, or if Reybold elects to perform such work itself or by contractors selected without the use of competitive bidding, the actual costs shall be based on reasonable and competitive rates."[51]

CalAtlantic admits that Reybold used competitive bidding for the clubhouse, tennis courts, landscaping plant material, fencing, and the pool.[52] There are also a number of other projects where Reybold used no competitive bidding process and chose to complete the work itself.[53] For the projects completed by Reybold, Mr. Poole, an engineer, testified to Reybold's use of reasonable rates by comparing

---

[50] CalAtlantic Post-Trial Opening Br. at 29-30.

[51] Settlement Agreement § 9.

[52] 3/12/25 PM Trial Tr. at 28-29.

[53] *See id.*; *see also* 3/11/2024 Trial Tr. at 134 (explaining how Reybold would complete the site work itself if it already had the equipment on site).

its rates with RSMeans construction cost data and relevant labor rates published by the State of Delaware.[54] This makes sense. Since Reybold was on the hook for the majority of the costs, overbilling wasn't in its best interest.[55]

CalAtlantic presented no contradictory evidence and was unconvincing in attacking Mr. Poole's credentials and calculations.[56] Put simply, the Court finds Reybold's evidence on this point credible. CalAtlantic didn't prove by a preponderance of the evidence that Reybold breached its "actual cost" requirement.

Even if Reybold's actions constitute a breach, CalAtlantic wasn't justified in refusing to pay the majority of invoices post-May 2019. If CalAtlantic had concerns about specific projects, then it had a right to request additional information from Reybold proving that it used "reasonable and competitive rates" after receiving the invoices.[57] But no requests were made.[58] Invoices were approved without question

---

[54] 3/12/25 AM Trial Tr. at 18-27 ("Q. And did you come to a conclusion as to whether the rates billed by Reybold to Lennar or rates of the project were competitive or reasonable based upon your comparison? A. They were reasonable and competitive.").

[55] *See* 3/11/2024 Trial Tr. at 134 ("Q. Did the Meridian Reybold entities have an interest in getting the lowest bid? A. Yes. Because we paid three-quarters of the bill.").

[56] *See* 3/12/25 AM Trial Tr. at 27-51.

[57] Settlement Agreement § 9 (stating that CalAtlantic could request "full and complete copies of invoices, receipts and other documentation [that were] reasonably requested . . . .").

[58] 3/13/2024 Trial Tr. at 33-34:

> Q. And did you ever make -- did CalAtlantic or Lennar ever make a request for supporting documents?
>
> A. Yes.
>
> Q. When?

until May 2019.[59]  From then on, payments stopped with no further explanation.[60]

CalAtlantic's response to what it now alleges was a breach was improper.

### b. Reybold's failure to comply with the certification requirement is not a material breach.

At trial, it was undisputed that Reybold only provided CalAtlantic with the requisite certifications once this litigation began.  But CalAtlantic never mentioned this deficiency or requested any certificate until the parties were in mediation.[61]  This issue was clearly only raised by CalAtlantic after the fact as a weak attempt to justify its refusal to pay.

Reybold's failure to produce any certificates wasn't a material breach because Reybold still substantially performed its duties.[62]  Reybold completed the work

---

A. In 2022.

Q. After mediation was started?

A. Yes.

[59]  *See* Pl.'s Ex. 33.

[60]  *See id.*

[61]  3/13/2024 Trial Tr. at 25:

A. I have no knowledge of anybody from CalAtlantic actually requesting those certifications prior to 2022.

Q. And that's March 22, 2022, as Mr. Garber's letter?

A. That's correct.

Q. Thank you. So up until that point in time until this case until mediation in mediation you were not aware of a single request from CalAtlantic for any type of certification?

A. That's correct.

[62]  *See Clean Harbors, Inc. v. Union Pac. Corp.*, 2017 WL 5606953, at *4 (Del. Super. Ct. Nov. 15, 2017), *aff'd*, 201 A.3d 1161 (Del. 2019) ("where there is a substantial performance, there can

required under the Settlement Agreement.[63] Put differently, the lack of a certificate did not "defeat the essential purpose of the contract or make[] it impossible for the other party to perform the contract"[64]—demonstrated by the fact that the parties relationship continued without ever abiding by that term.[65] The evidence demonstrates that CalAtlantic itself clearly didn't believe that the certificate was required (or material) because it never requested one or even questioned the lack of a certificate when it was presented with a pre-litigation invoice.

At best, CalAtlantic proved that Reybold committed a non-material breach of the Settlement Agreement on the certificate issue. But its burden on its breach-of-contract counterclaim doesn't end there—CalAtlantic has failed to demonstrate that Reybold didn't use "actual costs," so it isn't entitled to any damages for the "certificate" breach.

### 2. CalAtlantic's, on the other hand, was a material breach.

Since Reybold didn't materially breach the Settlement Agreement,

---

be no material breach.").

The Court need involve itself no further in the parties' quarrel as to whether CalAtlantic waived the certificate requirement. Any supposed breach in not providing them wasn't material.

[63] *See* Pl.'s Exs. 41-53, 55-71, 101-131.

[64] *See Shore Invs.*, 2011 WL 5967253, at *5 (quoting 23 Williston on Contracts § 63:3 (4th ed. 2021)).

[65] *See* Pl.'s Ex. 33 (referencing all paid invoices without production of a certificate up until May 2019); *see also* 3/13/2025 Trial Tr. at 19-21 (discussing the fact that the parties had multiple meetings).

CalAtlantic was not excused from paying.[66]  From May 2019 to June 2024, CalAtlantic had more than 50 outstanding invoices and only paid two of them.[67]  For total excusal of payment, typically one must show that the requested work wasn't completed.[68]  CalAtlantic never claimed that the work wasn't completed or raised any issue with the quality of the final product.  Its only claims against Reybold are based on procedural defects; its failure to pay is a material breach and entitles Reybold to damages.[69]

## B. Costs Covered by the Settlement Agreement

### 1. Ryland's (now CalAtlantic's) Proportionate Share is 23.94% for Common Facility Fees and Reybold Future Improvements.

CalAtlantic's proportionate share for Common Facility Fees and Reybold Future Improvements is 23.94%.  Section 9 of the Settlement Agreement does not permit any adjustments to the proportionate share based on changes in ownership of the dwelling units.

When contract terms are disputed, "the [C]ourt will first examine the entire

---

[66]  *See Daystar Const. Mgmt., Inc. v. Mitchell*, 2006 WL 2053649, at *7 (Del. Super. Ct. July 12, 2006) ("The converse of this principal is that a slight breach by one party, while giving rise to an action for damages, will not necessarily terminate the obligations of the injured party to perform under the contract." (quoting *BioLife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003))).

[67]  Pl.'s Ex. 33.

[68]  *See Commonwealth Const. Co. v. Cornerstone Fellowship Baptist Church, Inc.*, 2006 WL 2567916, at *21 (Del. Super. Ct. Aug. 31, 2006), *amended by* 2006 WL 2901819 (Del. Super. Ct. Oct. 3, 2006).

[69]  *See id.*

agreement to determine whether the parties' intent can be discerned from the express words used or, alternatively, whether its terms are ambiguous."[70] Ambiguity exists only if disputed contract language is "fairly or reasonably susceptible to more than one meaning."[71] Ambiguity does not exist merely "because the parties disagree on [the contract's] meaning."[72] "When the contract is clear and unambiguous, the Court will give effect to the plain-meaning of the contract's terms and provisions, without resorting to extrinsic evidence."[73]

"Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."[74] The Court will "read a contract as a whole and [] will give each provision and term effect, so as not to render any part of the contract mere surplusage."[75]

---

[70] *Catawba Assocs.-Christiana LLC v. Jayaraman*, 2016 WL 4502306, at *6 (Del. Super. Ct. Aug. 26, 2016) (internal quotation marks omitted) (quoting *Interactive Corp. v. Vivendi Universal, S.A.*, 2004 WL 1572932, at *9 (Del. Ch. June 30, 2004)).

[71] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[72] *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997).

[73] *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) (cleaned up).

[74] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)); *Vinton v. Grayson*, 189 A.3d 695, 704 (Del. Super. Ct. 2018) ("That requires a court to interpret a particular contractual term to mean 'what a reasonable person in the position of the parties would have thought it meant.'" (quoting *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006))).

[75] *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010) (citation omitted).

Section 9, governing the Common Facilities and Reybold Future Improvements, specifically states that:

> Ryland shall reimburse Reybold for Ryland's proportionate share of the cost of the Future Reybold Improvements ("Ryland's Proportionate Share") in accordance with the following terms. Ryland's Proportionate Share shall be 23.94%, or 203/848ths of the cost of the Future Reybold Improvements.[76]

In contrast, Section 13(h), governing security costs, states:

> Developer or the Association, as the case may be, shall pay the cost of job site security . . . subject to reimbursement by Ryland for Ryland's then-current proportionate lot share of such cost. Ryland's then-current proportionate lot share of such cost shall be calculated by multiplying such cost by a fraction the numerator of which is the number of Ryland Lots owned by Ryland in the Community as of the date of each invoice therefor and the denominator of which is 749 ("Ryland's Then-Current Proportionate Lot Share").[77]

The language in Section 9 is unambiguous. And comparison of other Settlement Agreement provisions only confirms its plain meaning. For security work—and only security work—the parties clearly intended that the proportion of costs would be constantly adjusted based on the "then-current proportionate lot share."[78] But Section 9 and its "Ryland's Proportionate Share" doesn't use such language.[79]

Instead, Section 9 gives an exact percentage and makes no reference to

---

[76]  Settlement Agreement § 9.

[77]  *Id.* § 13(h).

[78]  *See id.*

[79]  *See id.* § 9.

adjustments if ownership proportions change.[80] It's lacking the "then-current" proportionate language and the method to calculate that proportion. These sophisticated parties clearly knew how to draft a proportionate share that changes based on then-current ownership; they chose not to include that language in Section 9.[81] One simply cannot ascribe the same effect to "Rylands Proportionate Share" and "Ryland's Then-Current Proportionate Lot Share" with their markedly different terms. So, "Reybold's Proportionate Share" for work covered under Section 9 will remain at 23.94% because Section 9 can only be read as providing that fixed rate.

Also, Common Facility Fees will use the 23.94% proportionate share because its governing provision references the language in Section 9:

> The portion of Common Facility Fees subject to reimbursement from Ryland shall be *determined by multiplying the Common Facility Fee in question by Ryland's Proportionate Share (as defined in Paragraph 9 above)* at the time of reimbursement. . . .[82]

Since the Court has found that "Reybold's Proportionate Share" is 23.94%, not the previously billed 26.13%. Any costs still owed for Common Facilities and Reybold Future Improvements will be based on 23.94%.

---

[80] *Id*. ("Ryland's Proportionate Share shall be 23.94%, or 203/848ths of the cost of the Future Reybold Improvements.").

[81] *See Intermec IP Corp. v. TransCore, LP*, 2021 WL 3620435, at \*10 (Del. Super. Ct. Aug. 16, 2021) (referencing *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at \*2 (Del. Ch. Jan. 23, 2006) ("[I]t is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not. Rather, it is the court's job to enforce the clear terms of contracts.")).

[82] Settlement Agreement § 13(p) (emphasis added).

## 2. Management fees are not provided for in the Settlement Agreement.

Reybold is not entitled to management fees. Reybold claims that its right to management fees is incorporated into the Settlement Agreement via Exhibit A because it lists a "15% fee."[83] Reybold also states that CalAtlantic paid those management fees for a period of time without question, which means CalAtlantic waived any right to contest payment now.[84]

The Settlement Agreement contains no provision granting Reybold the right to any management fee. The term "Management Fee" isn't used within the Settlement Agreement.[85] The Court does not view the fact that Exbibit A noted a "15% fee" as an incorporation of that fee into the parties' relationship moving forward. Reybold provided no evidence at trial to support the contention that the parties intended for a 15% management fee at the time the Settlement Agreement was executed.

In fact, Reybold's interpretation directly contradicts the plain language of the Settlement Agreement. The Settlement Agreement states that Reybold is doing the work "for actual costs," with no mention of any type of management fee.[86] To add

---

[83] 3/12/25 AM Trial Tr. at 139-40; Reybold Post-Trial Answering Br. at 23.

[84] Reybold Post-Trial Answering Br. at 23-24.

[85] *E.g.*, 3/12/25 AM Trial Tr. at 139.

[86] Settlement Agreement § 9; 3/13/2025 Trial Tr. at 17-18, 142-45; 3/12/25 AM Trial Tr. at 144:

> Q. You don't dispute the fact that the actual body of the settlement agreement though does not mention management fees; right?

in such a requirement would mean that the work isn't done at "actual cost" and would go against the "'ordinary and usual meaning' of its terms."[87] If the parties wanted a 15% management fee within their Settlement Agreement, they would have expressly stated it.[88]

The parties never modified the Settlement Agreement to add a management fee. There is no evidence that the parties discussed adding a management fee and there is no writing on the issue.[89] With nothing in writing, the alleged modification wouldn't comply with the Settlement Agreement's modification provision.[90]

CalAtlantic also didn't waive its right to object to a management fee because waiver would also go against the express language of the Settlement Agreement that requires written waivers and prohibits any previous waiver from acting as a waiver for future breaches.[91]

---

A. It's in the exhibit, not in the – in the actual body or text of the agreement.

[87] *See Twin City Fire Ins. Co. v. Delaware Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003) (citing *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

[88] *See Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *27 (Del. Super. Ct. July 29, 2021) (referencing *McDonald's Corp. v. Easterbrook*, 2021 WL 351967, at *5 (Del. Ch. Feb. 2, 2021) ("Without this clear expression of intent, the Court has no cause to rewrite the [] Agreement to include commitments the parties themselves chose not to incorporate.")).

[89] *E.g.*, 3/12/25 AM Trial Tr. at 22-23.

[90] Settlement Agreement § 19(b) ("This Agreement may not be changed orally, but only by an agreement in writing, duly executed by or on behalf of the Party against whom enforcement of any waiver, change, modification, assignment, consent or discharge is sought.").

[91] *Id*. ("The waiver by any Party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach or violation of this Agreement. Further, no Party shall be deemed to have waived any provision of or right under this Agreement unless such waiver is set forth in writing signed by the Party against whom waiver is

- 22 -

Put simply, the Settlement Agreement doesn't permit a management fee.

**3. It is unclear whether the alleyway costs are covered by the Settlement Agreement, but, regardless, Reybold isn't entitled to reimbursement for them.**

The Court cannot find with any degree of certainty that the alleyways were meant to be covered.[92] Though, the Court can find with certainty that Reybold isn't entitled to reimbursement for the alleyways. At trial, there was conflicting testimony about whether the paving of alleyways was within the scope of the Settlement Agreement.[93] But if so, the paving would have been CalAtlantic's responsibility.[94]

---

asserted.").

[92] The Court hears the concerns raised by CalAtlantic stating that Reybold didn't assert a claim of breach-of-contract claim based Section 17 specifically. While this is true, the Second Amended Complaint still requested payment for the private alleyways, which means that that payment/breach claim was indeed fairly noticed here. Second Am. Compl. ¶ 27 (D.I. 25). As such, and considering the fact that evidence was heard on this issue at trial, the Court addresses the merits of the claim.

[93] *See* 3/12/25 AM Trial Tr. at 154-55:

> Q. Okay. Section 17 is the basis upon which, according to you, alleyway paving is to be reimbursed?
>
> A. Yes, sir.
>
> Q. Okay. And it doesn't use the word alleyway or rear alleyway; correct?
>
> A. It does not. Correct.
>
> Q. It talks about roadways; right?
>
> A. Uh-huh.
>
> Q. Okay. It doesn't say alleyway? It doesn't say rear alleyway; right? Yes?
>
> A. Correct. It does not.

[94] *See* 3/11/25 Trial Tr. at 142-46 ("Q. And why was the builder then, this case Ryland, agreeing to assume the responsibility for both the top coating of the roadways? A. Because that's what we -- one, we agreed to it . . . .").

So, regardless of whether it was covered under the Settlement Agreement, Reybold is not entitled to reimbursement.

Reybold tries to claim that the alleyways are covered under Article 17 because it states that "[CalAtlantic] will be responsible for . . . the topcoating of the roadways . . . that are associated with Third Party Lots."[95]  But, at best, that means it would be CalAtlantic's responsibility to actually pave them.[96]

But it appears Reybold made the unilateral decision to ignore the Settlement Agreement and pave the alleyways itself because it didn't want to delay its own progress.  It did so because it needed the County's sign-off to continue to receive permits for its lots.[97]  It seems Reybold wanted to control the timeline.  So it paved the alleyways on its own initiative knowing that it wasn't its responsibility, but hoping (without contractual promise) that CalAtlantic would pay for a portion.

Reybold has presented no evidence that there was any communication with CalAtlantic about the alleyways prior to paving.  This Court cannot now make

---

[95]  *See* Settlement Agreement § 17; 3/11/25 Trial Tr. at 142-46.

Since the parties seem to agree on this issue, the Court would just like to note that § 18 doesn't apply to the alleyways because the section only covers the paving for specific roads listed in its Exhibit H-6 which doesn't include the alleyways.  *See* Settlement Agreement § 18 (referencing Ex. H-6); *see also* Reybold Post-Trial Answering Br. at 28 (stating that Reybold admits that the eight private roadways aren't mentioned in the exhibit).

[96]  *See* Settlement Agreement § 17 ("Ryland agrees to assume responsibility for both the topcoating of the roadways and the turnover to New Castle County of the sewer facilities that are associated with the Third party Lots.").

[97]  *See* 3/11/25 Trial Tr. at 143-45.

CalAtlantic pay for a portion of the work it simply did not contract Reybold to complete but was done of Reybold's own volition.

Thus, Reybold is not entitled to reimbursement for paving the alleyways.

### 4. The date of turnover is December 31, 2021, and ends Reybold's right to reimbursement.

The date of turnover ends Reybold's entitlement to reimbursement. The Settlement Agreement states reimbursement is due "[d]uring the interval between the Effective Date of this Agreement and the date of Turnover, for those expenses incurred by Reybold for the operation and maintenance of the open space and common facilities . . . ."[98] Turnover is done by deed and execution of deed.[99] It occurs when the open space or deed for a portion of the project is "turned over to the community's maintenance corporation," "following inspection and approval by the County."[100]

Here, the deed was signed and executed on December 31, 2021.[101] While both parties state that turnover was completed in January 2022 at the latest,[102] no exact date was given and there would be no principled manner for the Court to separate

---

[98] Settlement Agreement § 14(p).

[99] 3/13/25 Trial Tr. at 7-8, 18.

[100] Settlement Agreement at C.

[101] Def.'s Ex. 3 (Turnover Deed).

[102] *See* Reybold Post-Trial Answering Br. at 22; *see also* CalAtlantic Post-Trial Opening Br. at 31.

out January invoices that are or aren't covered prior to turnover. Accordingly, the Court finds that December 31, 2021, is the date of turnover upon which Reybold's reimbursement rights for all open space and common facility fees ended. Put more simply, by contract, CalAtlantic's payment obligations ended on the date of turnover and that date was December 31, 2021.

Based on this finding CalAtlantic isn't entitled to declaratory judgment because the outstanding invoices incurred prior to the date of turnover are proper and payable.

## C. CALATLANTIC OWES A TOTAL OF $314,014.48 IN DAMAGES.

### 1. CalAtlantic owes $66,468.53 for Common Facility Fees.

For the Common Facility Fees, CalAtlantic owes $66,468.53. The Court looks at invoices from when the payments stopped to the date of turnover—that is, the period from June 2019 to December 2021.[103] To properly determine the amount owed, the Court looked at each individual invoice to remove the embedded improper 26.13% proportion share and the 15% management fee from its calculations.[104]

After removing the unpermitted management fees, the total amount of common facility fees was $282,399.55. And using a proper 23.94% proportionate share, CalAtlantic's share is $67,606.45.

---

[103] Pl.'s Exs. 33, 134.

[104] Pl.'s Ex. 101-31.

The Court must also add the security shares within invoices from June 2019 to May 2020 totaling $1,331.59.[105]

$$\$67,606.45 + \$1,331.59 = \$68,938.04$$

It will also consider the paid amount of $2,469.51 since June 2019.[106]

$$\$68,938.04 - \$2,469.51 = \$66,468.53$$

Accordingly, CalAtlantic owes $66,468.53 for Common Facility Fees.

## 2. CalAtlantic owes $247,545.95 for Future Reybold Improvements.

For Future Reybold Improvements, CalAtlantic owes $247,545.95. The Court reviewed all invoices from November 2014 to December 2021 to properly exclude the management fee and disallowed proportionate share.[107]

After removing the unpermitted management fees, the total amount of Future Reybold Improvements was $1,247,322. And using a proper 23.94% proportionate share, CalAtlantic's share is $298,608.89.[108]

---

[105] Pl.'s Exs. 101-12.

[106] Pl.'s Ex. 33.

[107] Pl.'s Exs. 41-53, 55-71.

[108] This share includes all costs associated with stormwater ponds. The Settlement Agreement specifically references that the storm water pond amount was "TBD." Settlement Agreement Ex. A. To the Court, this illustrates a clear intent of the parties for all stormwater pond costs to be covered and paid by both parties proportionally. Even though Reybold's billing practices weren't stellar, it has provided sufficient detail for these costs to be covered until the time of turnover. *See* Settlement Agreement Ex. F, at n.1. Within the invoices, the Court totaled all entries relating to ponds, retaining walls for ponds, and storm sewer piping. Pl.'s Exs. 41-43, 47, 57-67, 69-71. The total cost for stormwater pond work is $331,279.84. CalAtlantic's share at 23.94% is $79,308.39 for the stormwater ponds.

The Court must reduce the amount owed by the $51,062.94 that CalAtlantic has already paid.[109]

$$\$298,608.89 - \$51,062.94 = \$247,545.95$$

Accordingly, CalAtlantic owes $247,545.95 for Future Reybold Improvements.

In sum, CalAtlantic owes a total of $314,014.48 to Reybold for its unpaid proportion of Common Facility Fees and Future Reybold Improvements.

## D. LEGAL FEES AND PREJUDGMENT INTEREST

### 1. No attorney's fees will be awarded.

Neither side is due an award of attorney's fees. "When the parties' agreement governs an award of costs, the Court will look solely to that document to determine whether to award attorney's fees to the prevailing party on either an all-or-nothing or a claim-by-claim basis."[110]  Under the Settlement Agreement,

> [I]n the event that any Party to this Agreement breaches or otherwise fails to fulfill its obligations under this Agreement, and one or more other Parties to this Agreement initiates litigation to enforce this Agreement: . . . The prevailing Party in such litigation shall be entitled to an award of all attorney's fees and costs actually incurred in connection with the initiation and prosecution of that litigation.[111]

---

[109] Pl.'s Ex. 33.

[110] *Facchina Constr. Litigations*, 2021 WL 1118115, at *2 (Del. Super. Ct. Mar. 24, 2021) (citations omitted).

[111] Settlement Agreement § 15(b).

In this case, fee award on a claim-by-claim basis was not contemplated by the parties.[112]  So, the Court must determine if either was the "prevailing party" for the litigation as a whole.

"'Prevailing party' is a term of art that the parties bargained for in the contract[]."[113]  "Having chosen the common term 'prevailing party,' the parties can be presumed to have intended that that term would be applied by the court as it has traditionally done so."[114]  Typically, a prevailing party is one that has prevailed on most of its claims.[115]  But in this case, both parties have prevailed on some claims and lost on others.  Reybold succeeded in recovery of Common Facility Fees and Reybold Future Improvements (including stormwater ponds).  On the other hand, CalAtlantic succeeded in proving Reybold wasn't entitled to management fees, alleyway costs, or the higher proportionate share.  At bottom, in the Court's eyes, neither party walks away prevailing on the majority of its claims.

Accordingly, there was no prevailing party for the litigation as a whole and no attorney's fees will be awarded.

---

[112] *But cf. Facchina Constr. Litigations*, 2021 WL 1118115, at *2 ("This provision states, 'provided, that if a party prevails in part, and loses in part, in such Proceeding, the court . . . shall award a reimbursement of the fees, costs and expenses incurred by the parties on an equitable basis.' Thus, the Court looks at the results of each claim, assesses each party's success or failure thereon, and then compares each party's overall predominance in the litigation by ascribing relative weight and cost to each success and failure therein.").

[113] *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 281 (Del. 2022).

[114] *Id*. (quoting *Brandin v. Gottlieb*, 2000 WL 1005954, at *28 (Del. Ch. July 13, 2000)).

[115] *See Brandin*, 2000 WL 1005954, at *27.

## 2. Prejudgment interest is due.

Reybold is entitled to prejudgment interest. "In Delaware, prejudgment interest is awarded as a matter of right."[116] "It is not a matter of judicial discretion."[117]

"Prejudgment interest serves two purposes: first, it compensates the plaintiff for the loss of the use of his or her money; and, second, it forces the defendant to relinquish any benefit that it has received by retaining the plaintiff's money in the interim."[118] Both purposes would be served here. So, the Court finds that prejudgment interest is required and warranted. The rate will be based on the "legal rate" of interest described in 6 *Del. C.* § 2301, since there is no specific interest rate within the Settlement Agreement.[119]

Determining the accrual date is a bit more complicated. "The general rule is that prejudgment interest accrues from the date payment was due to the plaintiff because 'full compensation requires an allowance for the detention of the compensation awarded and interest is used as a basis for measuring that

---

[116] *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992).

[117] *Fortis Advisors, LLC v. Dematic Corp.*, 2023 WL 2967781, at *1 (Del. Super. Ct. Apr. 13, 2023) (citing *Moskowitz v. Mayor and City Council of Wilmington*, 391 A.2d 209, 210 (Del. 1978)).

[118] *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011) (referencing *Finkelstein v. Liberty Digital, Inc.*, 2005 WL 1074364, at *26 (Del. Ch. Apr. 25, 2005)).

[119] *See Rollins Envtl. Servs., Inc. v. WSMW Indus., Inc.*, 426 A.2d 1363, 1367 (Del. Super. Ct. 1980).

allowance.'"[120]

The Settlement Agreement states that:

> Ryland shall pay Ryland's Proportionate Share obligation for each Future Reybold Improvement within thirty (30) days after receipt of: (i) a certification . . . ; and (ii) full and complete copies of invoices, receipts and other documentation reasonably requested by Ryland . . . .[121]

But the Court cannot follow this payment structure to determine the accrual date because Reybold's billing practices didn't align with the Settlement Agreement; its production of invoices was haphazard.[122] So, the Court must take Reybold's own improper billing practices and its impact on the timeliness of payments into consideration.[123]

Without a clear date to follow within the Settlement Agreement, the Court will look to 30 days after Reybold's last invoice dump for the invoices covering the work completed until the date of turnover. The last covered invoice dump was on April 12, 2022, which included costs up until December 31, 2021.[124] Following the

---

[120] *Fortis Advisors*, 2023 WL 2967781, at *2 (citing *Moskowitz*, 391 A.2d at 210).

[121] Settlement Agreement § 9.

[122] *See Moskowitz*, 391 A.2d at 211 ("While interest is a matter of right in Delaware, the Trial Court does have some discretion in determining the amount of interest where there has been undue delay in the process of a lawsuit . . . .").

[123] *But cf. Brandywine Smyrna, Inc.*, 34 A.3d at 487 ("In *Moskowitz*, this Court noted the strong public policy that favors providing full compensation to prevailing plaintiffs who do not contribute to the defendant's delay in paying.") (referencing *Moskowitz*, 391 A.2d at 211).

[124] Pl.'s Ex. 33.

30-day payment language, the date of accrual for all costs is May 12, 2022.

## V. CONCLUSION AND VERDICT

Reybold and CalAtlantic entered into a Settlement Agreement in 2015 to try and repair their relationship. It didn't work. Now before the Court are their dueling breach-of-contract claims and counterclaims.

Following a three-day bench trial, the Court finds that both parties breached the Settlement Agreement in one way or another.

But CalAtlantic committed the only material breach by failing to pay Reybold for its portion of certain completed contracted-for work. Accordingly, the Court awards Reybold $314,014.48 in contract-borne damages, with the interest to be calculated as set forth herein.

The parties shall confer and, within 21 days, submit to the Court a proposed form of Order of Final Judgment consistent with these findings and verdicts.

**IT IS SO ORDERED.**

*/s/ Paul R. Wallace*

_____

Paul R. Wallace, Judge

Original to Prothonotary
Cc: All counsel via File & Serve